**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **GARY OTTE,** | ) | **CASE NO.  1:06CV1698** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **JUDGE PATRICIA A. GAUGHAN** |
| **v.** | ) | |
| | ) | |
| **MARC C. HOUK, WARDEN,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Respondent.** | ) | |

This matter is before the Court upon petitioner Gary Otte's Petition for Writ of Habeas Corpus.  (Doc. 16).

<u>**Introduction**</u>

Petitioner, Gary Otte, acting pursuant to 28 U.S.C. § 2254, filed a Petition for Writ of Habeas Corpus challenging his conviction and sentence of death rendered by an Ohio court.  The Respondent, Marc Houk, Warden, filed a timely Return of Writ and Otte filed a Traverse.  For the following reasons, the Petition for Writ of Habeas Corpus will be denied.

## I. Factual History

On March 19, 1992, a Cuyahoga County Grand Jury issued a twelve-count indictment against Otte.  The indictment charged Otte with four counts of aggravated murder, in violation of both Ohio Revised Code § 2903.01(A) and Ohio Revised Code § 2903.01(B) for the murders of Robert Wasikowski and Sharon Kostura.  The aggravated murder charges contained the following two death penalty specifications: (1) Otte committed the murder while committing aggravated robbery and aggravated burglary, as described in Ohio Revised Code § 2929.04(A)(7); (2) the aggravated murder of Sharon Kostura was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons, as described in Ohio Revised Code § 2929.04(A)(5).   In addition to the murder charges, the indictment also charged Otte with two counts each of aggravated burglary, kidnapping, and aggravated robbery.  Otte entered a plea of not guilty on February 27, 1992.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence presented at trial, upon considering Otte's direct appeal of his convictions and sentence:

> On February 11, 1992, Otte stole his grandfather's red 1962 Chevrolet Impala and .22 revolver and left Terre Haute, Indiana. He also stole two credit cards belonging to his uncle and aunt. Otte arrived in Parma, Ohio, the next day and tried to use the stolen cards in local stores, but they were confiscated.
>
> Otte next drove to see his friend Mike Carroll ("Carroll"). Carroll lived with his fiancee and Jerry "J.J." Cline ("J.J.") in the Pleasant Lake apartment complex in Parma.
>
> After that Otte drove to Gypsy and Rob's, a Cleveland bar, where he found J.J. Otte asked J.J. "if he was still robbing people." J.J. said he planned to "hit" two people at Pleasant Lake. One was a woman in her thirties with a Visa gold card; she lived alone "one building over" from J.J. and Carroll. The other was "an old man that lives diagonally from [Carroll's] apartment that is a drunk and has lots of money."

-2-

That evening, Otte returned to Pleasant Lake alone. He went to Carroll's apartment, but nobody was home. He then knocked on the door of Mary Ann Campangna ("Campangna"), who lived next to Carroll and across the hall from Robert Wasikowski. Otte claimed his car had overheated, said he was looking for Carroll, and asked for oil. Campangna told him she didn't have any, and Otte left.

Otte saw Wasikowski drive into the parking lot and thought that "that was the man" J.J. had described. Otte came out and asked Wasikowski for some oil, telling him the same story about his car overheating. As they spoke, Otte noticed that Wasikowski had been drinking. Wasikowski drove Otte to a gas station to buy oil.

When they returned, Otte asked to use Wasikowski's phone; after some hesitation, Wasikowski agreed. Otte followed Wasikowski into his apartment. Looking through her peephole, Campangna found this "very strange," so she continued to watch Wasikowski's door. Six or seven minutes later, Campangna heard "a very loud crack, cracking sound."

Inside the apartment, Otte pretended to make a phone call, then "tried to stall for time." Finally, Wasikowski asked Otte to leave. Otte went to the door, opened it, then slammed it shut and drew a gun. Wasikowski offered Otte $10 from his pocket. Otte pulled the trigger anyway, but the gun wouldn't fire. Wasikowski asked, "[I]t isn't loaded, is it[?]" Otte then fired the gun at Wasikowski's head. This time, it went off. Wasikowski fell to the floor, gasping and begging for help. Otte found this "the most horrible sight that I have ever seen"; nonetheless, he turned up the volume on the TV and went through Wasikowski's pants pocket, took out his wallet and took his cash, about $413. Otte searched for more money, but found only some fifty-cent pieces in the bedroom. He considered shooting himself, "but something told me not to," so he stole the fifty-cent pieces and left through the sliding glass patio door.

Otte then returned to Gypsy and Rob's, where he paid an $80 debt, played pool, drank, and took drugs. At 2:30 a.m., he left the bar, but continued to "party" until 10:00 or 10:30 a.m., when he checked into a hotel and slept until 5:00 p.m.

When Wasikowski failed to report for work on February 13, his employer called the Parma police. An officer entered the apartment and found Wasikowski dead. Robert Challener, the chief deputy county coroner, later performed an autopsy. He found that Wasikowski died from a gunshot to the head fired from less than two feet away.

Meanwhile, Parma police investigated the murder. Capt. Joseph Bistricky ("Bistricky") interviewed Mary Ann Campangna, who described the man she had

-3-

seen as "a white male, early 20's, six feet, thin to medium build, with blondish-brown hair, and a mustache." She suggested that Mike Carroll might know him.

Around 1:30 p.m., Bistricky interviewed Carroll, who said he knew the person Campangna had seen; his name was Gary, he was from Indiana, and he was driving his grandfather's car, a red 1962 Impala in good condition. Carroll's description of "Gary" matched Campangna's. Carroll promised to call police if he found out more about Gary's identity or location. Later that day Carroll told the police Gary would be at Gypsy and Rob's around 7:30 p.m.

On the evening of February 13, Otte went back to Pleasant Lake to rob Sharon Kostura. Otte knocked on her door; when she answered, he drew a .22 revolver and shoved his way in. He closed and locked the door. Kostura screamed and Otte shot her in the head. He stole about $45 from her purse, took her car keys and checkbook, and left through the patio door. Police later found Otte's fingerprint on that door.

After dinner, Otte returned to Gypsy and Rob's. He left with Carroll, J.J., and someone known as "Buster." They "smoked dope" in the Impala, then visited someone called "Patty." After leaving Patty's house, Otte dropped off J.J. and Buster near the bar.

Otte then drove past several police officers near Gypsy and Rob's. Because Carroll had told Capt. Bistricky that Otte would be at the bar that night, the officers were waiting for Otte. They pulled him over and ordered him to shut off the engine and throw out the keys. Carroll told the officers, "The guns are in the trunk." Officers opened the trunk and found a .22 caliber revolver and a .25 caliber semi-automatic pistol. The officers began an inventory search of the car but because of bad weather and a gathering crowd, Bistricky ordered the car towed, and the search was completed at the police garage.

In the glove compartment, police found Kostura's checkbook, a set of Hyundai car keys, and a box of .22 caliber live shells. In the passenger compartment, they found ammunition for the .25 caliber gun and a pillow with a red stain. A detective documented the items found on an inventory form.

Because Kostura had not reported her checkbook stolen, officers went to her apartment, where they found her still alive. Kostura was taken to the hospital and lived eight days, until February 21. Dr. Challener found that the gunshot wound to her head killed her.

Det. John Bomba interrogated Otte within an hour of his arrest on February 13. Otte denied going to the Pleasant Lake Apartments on February 12 or 13. He claimed he had no idea how Kostura's checkbook got into the car and "never even

-4-

saw the guns until the police said they were in the trunk."

On the afternoon of February 14, Det. Robert DeSimone interrogated Otte. Otte confessed to shooting and robbing Wasikowski and Kostura. On February 16, Otte signed a confession. On February 20, Otte asked to speak with DeSimone; he corrected part of his February 16 statement and answered questions.

*State v. Otte*, 660 N.E.2d 711, 715-16 (Ohio 1996).

## II. Procedural History

Prior to trial, Otte filed two motions to suppress evidence.  The first motion pertained to Otte's confession of the robberies and shootings.  After holding a hearing on this issue on June 25, 1992, the trial court denied the motion.  Otte also filed a motion to suppress the physical evidence obtained through the police search of the vehicle Otte was driving when apprehended.  The trial court held a separate hearing on this motion on June 29, 1992.  It overruled Otte's motion on that day.

Otte waived the right to a jury trial, electing to proceed before a three-judge panel.  Represented by trial counsel Patrick D'Angelo and Granville Bradley, the trial commenced on September 16, 1992.  The following day, the three-judge panel found Otte guilty of four counts of aggravated murder with both death specifications.  The panel found Otte guilty of two aggravated robbery charges and two aggravated burglary charges.  The panel acquitted Otte of the kidnapping charges.

The penalty phase of trial commenced on October 5, 1992.  The three-judge panel thereafter found that the aggravating circumstances outweighed the mitigating factors and sentenced Otte to death.  Additionally, the trial court imposed a separate sentence for the remaining convictions to run consecutive with the death sentence.  The panel issued a written opinion of its findings on October 8, 1992.

-5-

Represented by Larry W. Zukerman, Otte filed a timely direct appeal of the trial court's

decision to the Eighth District Court of Appeals setting forth eight assignments of error as

follows:

1.  The trial court erred in admitting into evidence physical items seized from appellant's automobile in violation of his rights against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 14 of the Ohio Constitution.

2.  The trial court erred in admitting appellant's taped and written statements, in violation of his privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article I, § 10 of the Ohio Constitution.

3.  The trial court erred in admitting appellant's taped and written statements which were taken without a voluntary, knowing and intelligent waiver of his right to counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Ohio Constitution.

4.  The appellant's death sentence must be vacated because the sentencing panel failed to give proper weight to appellant's voluntary intoxication and chronic alcoholism as a mitigating factor.

5.  The appellant's death sentence must be vacated because the sentencing panel impermissibly required proof of a psychosis as a mitigating factor pursuant to O.R.C. § 2929.04(B)(3).

6.  Appellant's voluntary intoxication at the time of the commission of the charged offenses precluded formation of the specific intent required by O.R.C. § 2903.01.

7.  Appellant was denied the effective assistance of counsel at both the "guilt phase" and "penalty phase" of his trial in violation of his right to counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 10 of the Ohio Constitution.

8.  The trial court erred when it admitted appellant's tape recorded statement because that statement (or a copy of that statement) was not timely provided pursuant to Criminal Rule 16(B).

*Return*, Apx. Vol. 4, at 4-5.  On October 27, 1994, the Eighth District Court of Appeals affirmed

-6-

the trial court's decision.  *State v. Otte*, No. 64617, 1994 WL 590556 (Ohio Ct. App. Oct. 27,

1994).

Otte appealed the Eighth District Court of Appeals' decision to the Ohio Supreme Court.

Represented by the same counsel, Otte raised the following seven propositions of law:

1. The trial court erred in admitting into evidence physical items seized from appellant's automobile, in violation of his right against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

2. The trial court erred in concluding that the admission of appellant's taped and written statements was not a violation of his Fifth Amendment privilege against self-incrimination, and his Sixth Amendment right to counsel.

3. The sentencing panel failed to give proper weight to appellant's voluntary intoxication and chronic alcoholism as a mitigating factor.

4. The sentencing panel impermissibly required proof of a psychosis as a mitigating factor pursuant to R.C. 2929.04(B)(3), and as a result, failed to consider appellant's chronic alcoholism as a mitigating factor pursuant to R.C. 2929.04(B)(3).

5. The trial court erred in concluding that the appellant's voluntary intoxication at the time of the commission of the charged offenses did not preclude his formation of the specific intent required by R.C. 2903.01.

6. The appellant was denied effective assistance of counsel at both the "guilt phase" and the "penalty phase" of his trial in violation of his right to counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

7. The trial court erred in upholding the admission of appellant's tape-recorded statement, where that statement (or a copy of that statement) was not timely provided pursuant to Criminal Rule 16(B).

*Return*, Apx. Vol. 5, at 11-12.  The Ohio Supreme Court affirmed Otte's convictions and death

sentence.  *State v. Otte*, 660 N.E.2d 711 (Ohio 1996).  Otte thereafter filed a petition for a writ of

certiorari with the United States Supreme Court, but that Court denied certiorari on October 7,

-7-

1996. *Otte v. Ohio*, 519 U.S. 836 (1996).

While his direct appeal was pending, Otte filed a petition for post-conviction relief in the trial court.  He raised the following eighteen causes of action:

1. The judgment and sentence against Petitioner Otte are void or voidable because the brief colloquy conducted by the trial court with Petitioner Otte, concerning the waiver of his right to trial by jury was insufficient to guarantee that Petitioner Otte made an intelligent, voluntary and knowing waiver of that right as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and §§ 5, 9, and 16, Article I of the Ohio Constitution.

2. The trial court's brief colloquy, and trial counsel's representation, failed to apprise Petitioner Otte of the relevant circumstances surrounding his jury waiver and the resulting consequences in violation of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

3. Petitioner Otte's conviction and/or sentence are void or voidable because the trial court lacked jurisdiction to try Petitioner Otte without a jury in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10, and 16, Article I of the Ohio Constitution.

4. The judgment and sentence against Petitioner Otte are void or voidable because he was not informed that he subjected himself to an increased risk of death by waiving his right to a jury trial in violation of his constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and §§ 5 and 16, Article I of the Ohio Constitution.

5. The judgment and sentence against Petitioner Otte are void or voidable because trial counsel were ineffective regarding Petitioner Otte's jury trial waiver in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 5, 9, 10, and 16, Article I of the Ohio Constitution.

6. Based on evidence outside and on the record, Petitioner Otte's convictions and sentences are void or voidable because Mr. Otte did not have the mental capacity to make a knowing, voluntary, and intelligent waiver of his right against self-incrimination as guaranteed by the Fifth Amendment

-8-

to the United States Constitution and Article 1, § 10 of the Ohio
Constitution.

7.    Based on information on and off the record, Petitioner Otte's convictions
and sentences are void or voidable because Petitioner Otte's trial counsel
did not request and accordingly did not introduce any expert evidence
relative to the effects of alcohol and crack cocaine on Petitioner Otte's
ability to make a voluntary, knowing and intelligent waiver of his Fifth
Amendment right against self-incrimination in violation of his
constitutional rights as guaranteed by the Fifth, Sixth, Ninth and
Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5,
9, 10, 16, and 20, Article I, of the Ohio Constitution.

8.    Petitioner Otte's convictions and/or sentences are void because defense
counsel did not request, nor did the trial court appoint, an independent
pharmacologist and/or toxicologist to assist counsel at the pretrial, trial,
and sentencing phases of trial in violation of his constitutional rights as
guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the
United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I, of
the Ohio Constitution.

9.    Based on evidence on and outside the record, Petitioner Otte's convictions
and sentences are void or voidable because he did not receive effective
assistance of counsel in the innocence/guilt phase of the trial in that
counsel for Petitioner Otte did not obtain experts in the fields of
pharmacology and/or psychology and accordingly, to present a defense of
not guilty by reason of insanity in violation of his constitutional rights as
guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the
United States Constitution and §§ 1, 2, 5, 10, 16, and 20, Article I, of the
Ohio Constitution.

10.    Based on evidence outside the record, Petitioner Otte's convictions and
sentences are void or voidable as Mr. Otte was incompetent to stand trial
and was denied effective assistance of counsel when his attorneys failed to
request a competency hearing pursuant to R.C. § 2945.37 prior to and
during the course of trial in violation of his constitutional rights as
guaranteed by the Sixth and Fourteenth Amendments to the United States
Constitution and §§ 10 and 16, Article I of the Ohio Constitution.

11.    The judgments and sentences against petitioner Otte are void or voidable
because he did not receive the effective assistance of counsel during the
penalty phase of his trial. Counsel fell far below a minimum standard of
reasonable legal representation by numerous actions and failures to act in
violation of his constitutional rights as guaranteed by the Fifth, Sixth,

Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

12. Petitioner Otte was denied effective assistance of counsel when his counsel failed to zealously defend petitioner at the mitigation phase of the proceedings in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

13. Petitioner Otte's convictions and/or sentences are void or voidable because defense counsel did not request, nor did the trial court appoint, an independent pharmacologist and/or toxicologist to assist counsel in the mitigation phase of his trial in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

14. Petitioner Otte's conviction and sentence are void or voidable because trial counsel failed to utilize a wealth of information that they possessed, and that would have assisted counsel in presenting the life history of Petitioner Otte in such a manner as to explain why the crime was committed and why a life sentence was proper in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

15. Petitioner Otte's conviction and/or sentence are void or voidable because the three judge panel failed to consider the mitigating factor of Petitioner Otte's good behavior and successful adjustment to prison life during his incarceration in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 2, 5, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

16. Petitioner Otte's convictions and/or sentences are void or voidable because the Ohio Death Penalty Scheme is unconstitutional on its face and as applied and is in violation of the United States Constitution and the Ohio Constitution in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

17. Petitioner Otte's attorneys failed to defend him zealously during the innocence/guilt phase of trial.  They failed to cross-examine five of the

-10-

seven prosecution witnesses.  They did not challenge the State's physical evidence.  They failed to offer any testimony on behalf of Petitioner Otte. As a result of these actions, Petitioner Otte's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I, of the Ohio Constitution were violated.

18.   Petitioner Otte's convictions and sentences are void or voidable because of the cumulative effects of the substantial constitutional violations set forth in his Causes of Action One through Seventeen in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

*Return*, Apx. Vol. 6, at 26-81.  The post-conviction court found none of Otte's causes of action had merit and denied post-conviction relief.  *State v. Otte*, No. CR-279973, slip op. (Ohio Ct. Common Pleas June 11, 1999).

Otte filed a notice of appeal on July 22, 1999, with the Eighth District Court of Appeals. He alleged the following two assignments of error:

1.   The trial court erred in dismissing appellant's post-conviction petition where he presented sufficient operative facts to merit an evidentiary hearing and discovery.

2.   Ohio post-conviction procedures do not afford an adequate corrective process nor do they comply with the due process or equal protection under the Fourteenth Amendment.

*Return*, Apx. Vol. 7, at 39-71.  The Eighth District Court of Appeals *sua sponte* dismissed the appeal because it was untimely.  *State v. Otte*, No. CR-279973, 2000 WL 1010861 (Ohio Ct. App. July 20, 2000).  Otte thereafter filed a motion to reconsider the decision to dismiss his appeal.  On August 29, 2000, the Eighth District Court of Appeals granted the motion, accepting Otte's assertion that he did not receive notice of the judgment entry.  *Return*, Apx. Vol. 7, at 238.

Upon reviewing the merits of Otte's assignments of error, the Eighth District Court of

-11-

Appeals affirmed in part, reversed in part, and remanded in part for the post-conviction court to

conduct an evidentiary hearing on certain claims.  *Return*, Apx. Vol. 7, at 242-269.  After a

hearing occurred on March 3 and July 28, 2003, the trial court again denied Otte relief.  *Return*,

Apx. Vol. 11, 264-78.

Otte filed a second appeal to the Eighth District Court of Appeals on April 7, 2004,

raising two assignments of error:

1.  The trial court erred by not granting relief on appellant's post-conviction petition, where the evidence adduced at the evidentiary hearing, in conjunction with his post-conviction petition exhibits, showed that appellant was denied his rights guaranteed under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments.

2.  The trial court erred by not applying applicable case law to the evidence presented at the post-conviction hearing, thereby denying appellant his rights guaranteed under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.

*Return*, Apx. Vol. 13, at 105-62.  The Eighth District Court of Appeals affirmed the post-

conviction court's decision on January 13, 2005.  *State v. Otte*, No. 84455, 2005 WL 77071

(Ohio Ct. App. Jan. 13, 2005).

Otte appealed the Eighth District Court of Appeals' decision to the Ohio Supreme Court,

asserting the following two propositions of law:

1.  The Court of Appeals' reliance on evidence from the direct appeal constituted factual error and an unreasonable determination of facts in light of the evidence presented at the postconviction evidentiary hearing, thereby violating Appellant's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and §§ 1, 2, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

2.  The Court of Appeals erroneously determined that the hearing-court judge did not abuse his discretion when he unreasonably determined the facts in light of the evidence presented at the evidentiary hearing, thereby violating Appellant's rights under the Fifth, Sixth, Eighth, Ninth, and

-12-

Fourteenth Amendments to the United States Constitution and §§ 1, 2, 9, 10, 16, and 20, Article I, of the Ohio Constitution.

*Return*, Apx. Vol. 14, at 34-81.  The Ohio Supreme Court declined jurisdiction to hear the case. *State v. Otte*, 830 N.E.2d 1169 (Ohio 2005)(Table).  Otte thereafter filed a petition for a writ of certiorari to the United States Supreme Court.  The Court denied the petition on January 9, 2006. *Otte v. Ohio*, 546 U.S. 1099 (2006).

While his post-conviction appeals were pending, Otte filed an application to reopen his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B).[1]  He asserted in that application that the trial court lacked jurisdiction to try him without a jury.  *Return*, Apx. Vol. 8, at 5-9.  The Eighth District Court of Appeals denied Otte's application on December 20, 2000. *Return*, Apx. Vol. 8, at 32-39.  Otte appealed the Eighth District Court of Appeals' decision on February 2, 2001.  He raised the following four propositions of law:

1. Appellant Otte was denied the effective assistance of counsel on his direct appeals in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

2. An appellate court commits constitutional error when it refuses to apply O.R.C. § 2945.05.

3. An appellate court commits constitutional error when it denies an application to reopen where the appellant has shown good cause for an untimely filing pursuant to Ohio R. App. P. 26(B).

4. An appellate court commits constitutional error when it denies an application to reopen where the appellant has attached a sufficient

---

[1]     That Rule states in pertinent part:
   **(B) Application for reopening**
         (1) A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel.
   Ohio R. App. P. 26(B).

affidavit of counsel pursuant to Ohio R. App. P. 26(B)(2)(d).

*Return*, Apx. Vol. 9, at 21-39.  The Ohio Supreme Court affirmed the Eighth District Court of Appeals' decision.  *State v. Otte*, 761 N.E.2d 34 (Ohio 2002).

### III.  <u>Habeas Proceeding</u>

Otte filed a Notice of Intention to file a Habeas Corpus Petition on July 14, 2006.  (Doc. 1).  Concurrently, he filed a motion for the appointment of counsel and a motion to proceed *in forma pauperis*.  The Court granted both motions and appointed Kevin M. Cafferkey and John B. Gibbons to represent Otte.  Otte filed a motion for reconsideration of the Court's order appointing counsel, which the Court subsequently denied.  (Doc. 9).

On January 5, 2007, Otte filed the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  (Doc. 16).  Five days later, he filed a motion to stay his execution pending the final disposition of his habeas petition.  (Doc. 19).  The Court granted the motion on January 12, 2007.  (Doc. 20).  On January 25, 2007, Otte filed a second motion for reconsideration of the Court's order appointing counsel, which the Court denied.  (Doc. 23).  Thereafter, Otte filed a motion for appointment of new counsel or for leave to file an interlocutory appeal.  (Doc. 31).  After conferring with court-appointed counsel, however, Otte filed a motion to dismiss his prior *pro se* motion, which the Court granted.  (Doc. 33).

The Respondent filed a return of writ on March 6, 2007.  (Doc. 26).  After requesting and receiving one extension of time, Otte filed a traverse on June 12, 2007.  (Doc. 38).  Respondent thereafter filed a sur-reply.  (Doc. 39).  Otte moved the Court for leave to file a response to the Respondent's sur-reply.  (Doc. 40).  The Court granted Otte's motion and Otte filed his response on August 6, 2007, rendering the matter ripe for disposition.  (Doc. 42).

-14-

**IV.  Petitioner's Grounds for Relief**

Otte asserts fifteen (15) grounds for relief.  These grounds are as follows:

1.      The State of Ohio trial court erred in denying Otte's post conviction cause of action that Petitioner's Jury Waiver was not knowing, [sic] intelligent and voluntary because Petitioner was on an anti-psychotic drug when agreeing to waive a jury, violating Petitioner's rights to due process and a fair trial.

2.      The State trial court erred in not fully explaining to Petitioner his right to a jury trial and the potential consequences of that waiver denying Petitioner his right to due process of law.

3.      The State trial court lacked jurisdiction to try Petitioner Otte without a jury and violated Petitioner's right to due process of law and a fair trial.

4.      Petitioner's rights to due process and a fair trial were violated when [the] State trial court failed to inform Petitioner that jury waiver increased his risk of death.

5.      Trial counsel erred in failing to explain to Petitioner the effect a jury waiver would have on his case at trial, sentencing and appeal violating the Petitioner's constitutional rights to due process and a fair trial.

6.      The cumulative effect of the anti-psychotic medication, the trial court's failure to explain, the trial attorneys' failure to explain and the Petitioner's low I.Q. caused the Petitioner's waiver not to be knowing, voluntary and intelligent violating the Petitioner's right to due process and a fair trial.

7.      Petitioner's convictions and sentence are void and or voidable because Petitioner did not have the mental capacity to make a knowing, voluntary and intelligent waiver of his right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution.

8.      Trial counsel erred in failing to introduce any expert evidence relative to the effects of alcohol and crack cocaine on Petitioner's ability to make a voluntary, knowing and intelligent waiver of his Fifth Amendment right to due process and a fair trial.

9.      Trial counsel erred in not requesting an independent pharmacologist or toxicologist to assist counsel at all phases of trial violating Petitioner's right to due process and a fair trial.

-15-

10.     Petitioner was denied his constitutional right to effective assistance of counsel during the trial and guilt phase of his trial in the State of Ohio trial court.

11.     Trial counsel failed to adequately investigate mitigating evidence, present mitigation evidence and failed to provide effective assistance of counsel at the mitigation phase of his death penalty trial.

12.     Petitioner Otte was denied due process because both the trial court and the appellate courts failed to fulfill their statutory duties in imposing and reviewing his sentence of death, and the appellate courts failed to fulfill their obligation to meaningfully review the proportionality of Petitioner Otte's death sentence.

13.     Petitioner Otte's death sentence is unfairly disproportionate to similar cases, the Ohio courts denied him due process by failing to properly consider the proportionality of his death sentence.

14.     Ohio's death penalty statute is unconstitutional in numerous respects.

15.     Mr. Otte's conviction and sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial and in all subsequent proceedings.

(Doc. 16, at 15-69).

## V.  <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Otte's petition was filed on January 5, 2007, well after the AEDPA's effective date, the AEDPA governs this Court's consideration of his petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (citing *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of the AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, – U.S. – , 127 S.Ct. 2218, 2224 (2007)(citations omitted).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's reasoning and/or application of federal law and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).[2]  The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1)

---

[2]      Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," circuit courts of appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."  *Hill v.*

are independent tests and must be analyzed separately.  *Williams*, 529 U.S. at 412-13; *Hill*, 337 F.3d at 711.   A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a context where it should apply.  *Id.* at 407; *Hill*, 337 F.3d at 711.  As the Supreme Court recently advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, – U.S. –, 127 S.Ct. 1933, 1939 (2007)(citing *Williams*, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  *Id.*

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that section of 2254(d) in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In that

---

*Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

-18-

case, the Court noted that a "clear factual error," such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant, constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id.* at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach a different conclusion were we reviewing the case *de novo*, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary.").  This presumption only applies to basic, primary facts, and not to mixed questions of law and fact. *See Mason*, 325 F.3d at 737-38 (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were adjudicated on the merits in the state court proceeding.  *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  *Id.*; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).[3]  In such a case, the habeas court is not limited to deciding whether that court's decision

---

[3]     Prior to *Maples*, the Sixth Circuit had applied the AEDPA standard of review to claims which had not been explicitly mentioned or analyzed by the state courts. *See e.g., Clifford v. Chandler*, 333 F.3d 724, 730 (6th Cir. 2003); *Doan v.*

was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *Maples*, 340 F.3d at 436-37; *Benge v. Johnson*, 312 F. Supp.2d 978, 987 (S.D. Ohio 2004).[4] If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)(citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

## VI.  Exhaustion and Procedural Default

### A. Exhaustion

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that a petitioner has not yet pursued,

---

*Brigano*, 237 F.3d 722, 727 (6th Cir. 2001).  However, in *Maples*, the Sixth Circuit found that *Doan* and *Clifford* had been abrogated by the United States Supreme Court's decision in *Wiggins*.  *Maples*, 340 F.3d at 437.

[4]     To the extent that the state court did not address a claim due to petitioner's failure to raise it on direct review, the claim may have been procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Maples*, 340 F.3d at 437-38.

exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust*, 17 F.3d at 160.[5]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)(quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001))(internal quotation marks omitted).  Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Buell*, 274 F.3d at 349.   To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000)(citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

Here, although the Respondent does not waive the exhaustion requirement, he concedes that the claims Otte raises in the Petition are exhausted.  (Doc. 26, at 20).  The Court performs no further exhaustion analysis on Otte's grounds for relief.

### B. Procedural Default

In general, a federal court may not consider "contentions of general law which are not

---

[5]     The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing *Coleman*, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims.  *O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions

-22-

in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001)(citing *Maupin*, 785 F.2d at 138)(further citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, "that a later decision rejecting the claim did not silently disregard the bar and consider the merits." *Ylst*, 501 U.S. at 803. "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review." *Id.* at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted. However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or (2) a fundamental miscarriage of justice would result from a bar on federal review. *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275.

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp.2d 796, 801 (E.D. Mich. 2002). Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488; *Mohn*,

-23-

208 F. Supp.2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause.  *Murray*, 477 U.S. at 488-489; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Mohn*, 208 F. Supp.2d at 801, 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  *Murray v. Carrier*, 477 U.S. 478, 488-489 (1986).  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim.  *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995)(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."  *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  *Dretke v. Haley*, 541 U.S. 386, 392 (2004)(citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1985)).  When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing

-24-

evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

While Otte generally recites the *Maupin* test as the applicable test to review a claim for procedural default, he does not specifically apply this test in the procedural default section of his traverse. Instead, Otte defends each assertion of procedural default when he addresses the individual grounds for relief. The Court likewise addresses claims of procedural default when it reviews Otte's individual claims.

## VII. <u>Analysis of Petitioner's Grounds for Relief</u>[6]

### A. Grounds for Relief 1-6 - Jury Waiver Claims

In these grounds for relief, Otte maintains that several aspects of his jury waiver were constitutionally deficient. He first asserts that the post-conviction court erred when it found, after conducting a hearing on the issue, that his jury waiver was knowing, voluntary, and intelligent. He also argues that the trial court erred and trial counsel were ineffective when they failed to explain to Otte the repercussions of waiving this right, including that the waiver would increase his risk of receiving a death sentence. Otte alleges that the state court lacked jurisdiction to hear his case without a jury under Ohio law. Finally, Otte contends that the individual and cumulative effect of these errors entitles him to habeas relief. The Court now reviews Otte's individual claims pertaining to this issue.

**1. The State of Ohio trial court erred in denying Otte's post conviction cause of action that Petitioner's Jury Waiver was not knowing, [sic] intelligent and**

---

[6]    Each of Otte's claims is set forth in bold at the beginning of the discussion of that claim.

**voluntary because Petitioner was on an anti-psychotic drug when agreeing to waive a jury, violating Petitioner's rights to due process and a fair trial.**

In this ground for relief, Otte argues that the post-conviction court wrongly decided that his jury waiver was knowing, voluntary, and intelligent.  He claims that because he was taking the anti-psychotic drug Mellaril at the time of his jury waiver hearing, he was not competent to waive this right.  He also maintains that the trial court erred when it failed to inform him about the jury unanimity requirement.  Finally, he asserts that the trial court should have inquired whether he was on drugs prior to accepting his jury waiver.  The Court reviews each of Otte's sub-claims separately below.

### a. Anti-psychotic drug use

After his arrest and subsequent incarceration, Otte complained to the consulting prison psychologist, Dr. J. Shin Lee, that he was having difficulty sleeping.  Dr. Lee prescribed the drug Mellaril, an anti-psychotic medication, to ease Otte's insomnia.  Otte was still taking Mellaril on June 25, 1992, the day of his jury waiver hearing.  On that date, the trial court asked counsel whether he had discussed jury waiver with his client.  Counsel responded affirmatively as follows:

> I discussed with Mr. Otte his right to trial by jury, or try it to a three Judge panel,
> and I advised him pursuant to the discussions of the Court and I recommended to
> him that we try the case to a three Judge panel, and I recommended to him the
> members of the panel will be Judge Richard McMonagle, Judge Wells, and Judge
> Gorman.  And he agreed to waive his right to jury trial.

*Return*, Tr. Trans., Vol. 1, at 4-5.  The trial court then questioned Otte directly regarding whether he wished to forego his jury trial right:

-26-

THE COURT:       Is that correct, Mr. Otte?

THE DEFENDANT:  Yes.

THE COURT:       You read the form about waiving your right to trial by jury?

THE DEFENDANT:  Yes.

THE COURT:       You agree that is your signature?

THE DEFENDANT:  Yes.

THE COURT:       And it's signed by both your counsel as witnesses?

THE DEFENDANT:  Yes.

*Id.* at 5.  Otte argues that these brief, one-word responses to the trial court do not support the post-conviction court's conclusion that he made a knowing, voluntary, and intelligent waiver.

As stated above, although the post-conviction court initially denied Otte relief, the Eighth District Court of Appeals affirmed in part, reversed in part, and remanded in part for the post-conviction court to conduct an evidentiary hearing on certain claims.  *Return*, Apx. Vol. 7, at 242-269.  The post-conviction court conducted hearings regarding, *inter alia*, Otte's jury waiver claims on March 3 and July 28, 2003.

During these hearings, Otte called several witnesses to support his claim.  He called his mother, Nancy Otte, who testified that one of Otte's trial counsel told her that, while Otte did not truly wish to waive his right to a jury trial, "his attorneys had talked Gary into that . . . ."  *Return*, Tr. Trans., Vol. 5, at 39.  Otte also called Dr. Richard Nockowitz, a psychopharmacologist, to testify.       Dr. Nockowitz opined after reviewing court records that Otte was not competent to waive his jury trial rights because of the impact that the side effects of the Mellaril had on him.  He explained that one function of the drug is that it blocks the transmission of the chemical

-27-

dopamine to the brain.  *Id.* at 61.  He noted that blocking dopamine to certain portions of the

brain causes akathisia, or restlessness in the body.  Dr. Nockowitz explained that akathisia is

often confused with agitation.  He concluded that Otte's sleep troubles and agitation were caused

by the increased levels of Mellaril Dr. Lee prescribed to him.  *Id.* at 66.  He also observed that

the records indicated Otte reported hallucinations in the form of seeing eyes in his prison cell air

vent.  Dr. Nockowitz testified that these hallucinations were another side effect of the Mellaril.

*Id.* at 71.  He further observed that Otte's I.Q., which was 78 when taking the Mellaril in 1992,

was 84 in 1994.  Dr. Nockowitz concluded that the Mellaril and its disturbances in Otte's

thought processes caused this decrease in I.Q.  Based on the above conclusions, he opined that

Otte's mental state on June 25, 1992, precluded him from rendering an informed waiver of his

rights.  When asked during cross-examination how Otte was able to testify articulately during a

suppression hearing, which was held immediately following the jury waiver hearing, but was

somehow incompetent to waive his right to a jury trial, Dr. Nockowitz responded that delirium

can fluctuate from one moment to the next.  *Return*, Tr. Trans., Vol. 5, at 99.

        The State called Dr. Sandra McPherson, the court-appointed psychologist who examined

Otte prior to trial, to testify in its behalf during the evidentiary hearing.  Dr. McPherson stated

that she had no concerns about Otte's competency to waive his jury trial rights prior to trial.  *Id.*

at 205.  The State also called Dr. Lee, who prescribed the Mellaril for Otte.  Dr. Lee stated that

he initially prescribed the drug because Otte was complaining of insomnia.  He observed during

one of his visits with Otte that Otte indicated the Mellaril was in fact helping him sleep.  *Id.* at

216.  Dr. Lee further testified that he did not observe any indications that Otte was psychotic.

He indicated that, while he observed Otte, he appeared to be oriented to the "three spheres," *i.e.*,

he was aware of the current time and place where he was located, as well as aware of the person

to whom he was speaking.

The State called Otte's trial counsel, Patrick D'Angelo, to testify.  D'Angelo stated that

he could not recall any concerns about Otte's competency.  *Return*, Tr. Trans., Vol. 5, at 240.

He testified as follows:

> As I sit here today, I don't recall anything that was of concern to us or set off any
>
> flags, so to speak, where we would have had pause or concern about whether or
>
> not he was competent to [waive his right to a jury trial], otherwise, we would have
>
> addressed it and if need be even confer with the court about that.

*Id.* at 250.

Finally, the State called Dr. Phillip Resnick to testify.  Like Dr. Nockowitz, Dr. Resnick

formed his opinions based on the post-conviction record.  He concluded that Otte was competent

to waive his right to a jury trial on June 25, 1992.  Dr. Resnick cited the transcripts from the

suppression hearing during which Otte was able to recall past events, concentrate on the

questions posed to him, and provide relevant answers, as evidence that Otte was not cognitively

impaired on that date.  *Id.* at 300.  Dr. Resnick also observed that during Otte's unsworn

statement, given in October of 1992, he was "able to make the statement on his own, which

would show the capacity to retain several thoughts, organize them and present them in a clear

fashion."  *Id.* at 302.  He also reviewed the psychological testing of Dr. McPherson, who found

no evidence of organic brain disease or cognitive impairment.  *Id.* at 303.

Dr. Resnick disagreed with Dr. Nockowitz's conclusions regarding the side effects of

Mellaril.  Dr. Nockowitz had concluded that because Otte suffered from constipation, one side

-29-

effect of the drug, he necessarily would experience all the drug's side effects, including akathisia. Dr. Resnick disagreed. He concluded that, in his experience with Mellaril, patients will experience some side effects but not others. Thus, he opined, merely because Otte suffered from constipation, it would not necessarily follow that he must have suffered from akathisia. *Id.* at 309. He also disagreed with Dr. Nockowitz's opinion that Otte's agitation was caused by the Mellaril. Noting that Otte had an episode of screaming and violent behavior prior to ingesting Mellaril, Dr. Resnick concluded that Otte's agitation was not necessarily a side effect of it.

Ultimately, Dr. Resnick opined that Otte was competent to waive his right to a jury trial. In addition to the above evidence, Dr. Resnick based his opinion on Otte's I.Q. test, which Dr. Resnick explained revealed that Otte had the intellectual capacity to make such a decision. He dispelled the defense theory that Otte had hallucinations because there were indications in the record that Otte's report of seeing eyes in the air vent were related to a voodoo book Otte was reading. Dr. Resnick stated that because Dr. McPherson recorded no signs of psychosis and because Otte had no such prior medical history, he did not believe Otte suffered from this impairment.[7]

The post-conviction court concluded in its opinion that Otte's waiver of his right to a jury trial was knowing, voluntary, and intelligent. It reasoned as follows:

> The record is clear that none of the defendant's trial attorneys stated that he was
> unable to understand the ramifications of waiving his right to a jury trial. This
> Court, itself, was one of the individuals who actually heard the jury waiver.

---

[7] Additional portions of the evidentiary hearing testimony will be set forth as relevant to other grounds for relief.

-30-

At that time, however, this Court was unaware of any of the underlying

facts regarding the reason for this appeal, *i.e.*, the defendant was taking a

prescribed drug, Mellaril at the time of his waiver.  The treating physician, the

trial expert Dr. McPherson, and the review of the record and comments of his trial

attorney Pat D'Angelo, and the jury waiver colloquy and the testimony of Dr.

Resnick show that in fact Mr. Otte was not so impaired that he did not understand

the ramifications of his right to a jury trial.  After a thorough review of the record

and testimony this Court finds that Otte voluntarily waived his right to a jury trial.

*Return*, Apx. Vol. 11, at 264-65.

The Eighth District Court of Appeals affirmed the post-conviction court's decision,

finding that, while there was conflicting expert testimony, there was sufficient evidence in the

record from which the post-conviction court could draw its conclusions.  It opined as follows:

> Otte did present conflicting evidence through the expert testimony of Dr.
> Nockowitz, et al. Specifically, Nockowitz opined that Otte's use of Mellaril
> rendered him unable to make a knowing and intelligent waiver of his right.
> Nockowitz based his opinion on the progress notes of the treating physician as
> well as his expertise as a psychopharmacologist. On cross-examination, however,
> he conceded that there are no medical records that document Otte's condition on
> June 25, 1992, the date of the waiver. And Otte was able to testify with some
> specificity at his suppression hearing that same day. Nockowitz suggested that
> Otte's ability to testify would not be indicative of his ability to enter a knowing
> and intelligent waiver of his legal rights.
>
> Otte attacks the evidence relied upon by the trial court, essentially arguing it
> should be given no weight. Our review of the record indicates that Dr. Resnick
> based his opinion on a myriad of sources in addition to those sources considered
> by Nockowitz. Unlike Nockowitz, Resnick found it significant that Otte was able
> to give coherent testimony at his suppression hearing on June 25, 1992. Resnick
> also pointed out that jail records reflect Otte engaged in violent behavior even
> before he received anti-psychotic medication. In his opinion, there was no
> evidence to conclude that Otte's waiver was unknowing and involuntary.

-31-

Resnick was qualified as an expert and we see no reason why his opinion should be afforded no weight. Quite simply, the experts presented conflicting testimony, which the trial court, in an appropriate exercise of its discretion, resolved in favor of the State.

Dr. McPherson's testimony was relevant to answer the question of this Court as to whether she knew Otte was being prescribed Mellaril. She verified that she was aware that Otte was on this medication. While McPherson may not have specifically tested Otte's competency, she made clear she had no concern that he was unable to waive his right to a jury. Trial counsel also had no concerns about Otte's ability to effectively waive this right; nor is any such concern reflected in the jury colloquy.

Mrs. Otte offered hearsay testimony that one of Otte's attorneys told her that Otte did not want to waive his right to a jury trial but they had convinced him to do so. However, that attorney did not testify at the evidentiary hearing. Further, Otte's other trial counsel indicated that Otte was advised and agreed to waive his right to a jury trial. This evidence has no bearing on Otte's cognitive ability to waive his right and it is not sufficient to make the trial court's decision an abuse of discretion.

We find that the trial court relied upon competent, credible evidence to support its resolution of this issue in favor of the State.

*State v. Otte*, No. 84455, 2005 WL 77071, at *2-3 (Ohio Ct. App. Jan. 13, 2005).

This Court must now decide whether the Eighth District Court of Appeals' decision was an unreasonable application of any United States Supreme Court precedent, which has held that the right to a jury trial is a fundamental constitutional right.[8] *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).  The Sixth Circuit recently held that a habeas petitioner could not establish cause and prejudice to excuse the procedural default of a jury waiver claim.  In *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007), the court articulated the knowledge a criminal defendant must possess

---

[8]     Otte filed a separate brief urging the Court to conclude that any defect in the jury waiver should be construed as structural error not subject to a harmless error test by this Court.  (Doc. 42, at 6).  Because, as is described below, the Court undertakes a merit review of these claims and finds no error occurred, it does not subject the claims to a harmless error test.  Thus, Otte's assertions are inapposite.

-32-

to validly waive his or her right to a jury trial.  Observing that a waiver must be knowing, voluntary, and intelligent, it held that these requirements are satisfied  if "the defendant 'understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge.'" *Id.* at 698 (quoting *Sowell v. Bradshaw*, 372 F.3d 821, 836 (6th Cir. 2004)).

The Court also finds the Sixth Circuit opinion in *Filiaggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006), to be instructive.  In that case, the habeas petitioner asserted that he did not knowingly and intelligently waive his jury trial rights because of an electrical shock he received by a stun belt on the morning of his waiver.  Like Otte, the petitioner in that case asserted that this shock and the subsequent ingestion of valium to relieve the symptoms associated with the shock rendered him unable to relinquish his jury trial rights.

The Sixth Circuit found the petitioner's claim to be without merit and affirmed the district court's denial of the writ on this issue.  It held that while the petitioner had received an electric shock and had ingested valium on the morning of his jury waiver, it found no support in the record that the petitioner was unable to waive his rights by the time the court began proceedings later that day.  Moreover, it concluded that defense counsel, one of whom was a physician, never indicated to the trial court that the petitioner was unable to waive his jury trial right.  *Id.*   Accordingly, the court found that the petitioner had failed to meet the burden of establishing deficiencies in the jury waiver "not as a matter of speculation but as a demonstrable reality."  *Id.* at 855.

In this case, there is no dispute that Otte signed a written waiver of his right to a jury trial and that it was also signed by both parties and adopted by the trial court.  Thus, like the jury

waiver issue raised in *Haliym*, the only outstanding issue here is whether Otte's waiver was knowing, voluntary, and intelligent.  The Eighth District Court of Appeals found that, despite conflicting evidence presented at an evidentiary hearing on this issue, the testimony of trial counsel, the trial psychologist, Otte's own testimony during the suppression hearing on the same day as the jury waiver hearing, and the testimony of Dr. Resnick supported the post-conviction court's finding that Otte's right to a jury trial was voluntarily and intelligently waived.

The Court finds that this decision is not contrary to or an unreasonable application of any United States Supreme Court precedent and that Otte cannot demonstrate that the state courts made unreasonable factual findings in light of the evidence presented in the post-conviction relief hearing.  28 U.S.C. § 2254(d).  The Eighth District Court of Appeals based its decision on a wealth of evidence provided at the evidentiary hearing.  Both trial counsel and the trial psychologist noted no concerns regarding Otte's competency.  Moreover, the post-conviction court, which was the same court that heard Otte's initial jury waiver, also did not observe any apparent competency issues.  Although Otte supplied testimony from Dr. Nockowitz who found that he was incompetent to waive his jury trial rights, Dr. Resnick, who based his opinion on the identical records, came to the opposite conclusion.  Thus, it was not unreasonable for the Eighth District to credit Dr. Resnick's opinion over Dr. Nockowitz's opinion given the other evidence presented at the hearing.  Moreover, similar to the *Filiaggi* court's finding, the Court here determines that the mere fact that Otte was on prescribed medication when he waived his rights does not invalidate his waiver *per se*.  Accordingly, the Court finds that Otte cannot overcome the presumption of a valid waiver by asserting that the ingestion of Mellaril during the time in which he waived his right to a jury trial rendered that waiver unknowing or involuntary.  This

-34-

sub-claim is not well-taken.

### b. Failure to inform about unanimity requirement

Otte next argues that the trial court should have informed him that all twelve members of a jury must agree on a death sentence rather than merely the agreement of three judges.  The Respondent contends that this claim is procedurally defaulted.  Although Otte raised it to the Eighth District Court of Appeals on appeal from post-conviction proceedings, the Eighth District held that this claim was barred by *res judicata* because Otte could have raised it on direct appeal. *Return*, Apx. Vol. 7, at 255.

In *State v. Perry*, 226 N.E.2d 104 (Ohio 1967), the Ohio Supreme Court held that a final judgment of conviction bars a convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on appeal from that underlying judgment.  *Id.* at 108; *see also State v. Roberts*, 437 N.E.2d 598, 601 (Ohio 1982)(holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues).  Thus, unless a claim is based on evidence *dehors* (outside of) the record, it must be raised during direct appeal, or be deemed waived.  The Sixth Circuit has specifically held that Ohio's application of the *res judicata* doctrine under *Perry* is an adequate and independent state ground on which to invoke a procedural default bar. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

Otte provides a cursory response to the allegation of procedural default, claiming that "ineffectiveness of direct appeal appellate [sic] counsel would redeem the waiver."  (Doc. 38, at

-35-

14).  Without more detail regarding how counsel's failure to raise this claim on direct appeal was unreasonable and prejudiced the outcome of his first appeal as of right pursuant to *Strickland v. Washington*, 466 U.S. 688 (1984), the Court rejects Otte's assertions.  Thus, this sub-claim is procedurally defaulted.

Even if ripe for habeas review, Otte's claim would have no merit.  As stated above, the Sixth Circuit, interpreting United States Supreme Court precedent, has held that to constitute a knowing, voluntary, and intelligent jury waiver, a criminal defendant need only know that his case will be decided by a judge or panel of judges, rather than twelve members of the community.  *Haliym v. Mitchell*, 492 F.3d 680, 698 (6th Cir. 2007).   Based on trial counsel's representations to the court at the jury waiver hearing, Otte understood that he was going to forego his right to a jury trial and be tried by three panel members.  *Return*, Tr. Trans., Vol. 1, at 4-5.  Because these representations were made at the time of the waiver, the Court finds that they bear particular indicia of credibility.  Moreover, as there is no constitutional right to be informed about the unanimity of a jury, there was no constitutional violation.  This claim has no merit.

### c. Trial court never inquired whether Otte was taking drugs before accepting jury waiver

Finally, Otte asserts that the post-conviction court erred by not granting him relief based on the trial court's failure to inquire whether he was taking any medication prior to his jury waiver.  The Respondent asserts that this claim is procedurally defaulted because Otte failed to raise it at any juncture of his state-court appeals.  As stated above, to exhaust a claim, a habeas petitioner must first present it to the state courts.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  Otte does not assert any argument to remove the procedural bar.  Thus, the Court finds that this claim is procedurally defaulted and not entitled to a merit review because Otte has not asserted

that he in fact raised this claim in state court or that his failure to do so should be excused on any other basis.[9]

> **2. The State trial court erred in not fully explaining to Petitioner his right to a jury trial and the potential consequences of that waiver denying Petitioner his right to due process of law.**

In this ground, Otte argues that the trial court erred in accepting his jury waiver on several theories. First, he contends that the trial court should have inquired whether he was on medication at the time of the waiver. He also asserts that the trial court's brief, on-the-record colloquy which elicited four, one-word responses from him, was insufficient to effectuate the waiver. He argues that the trial court should have provided him with an in-depth explanation of the right that Otte was relinquishing and an explanation of the requirement that a jury be unanimous in its decision. Finally, Otte contends that the trial court should have questioned whether he was freely waiving the right to a jury trial or whether he was doing so under threat or influence of another.

The Respondent asserts that this claim is procedurally defaulted because the Eighth District Court of Appeals held on post-conviction review that it was barred by *res judicata*. Otte counters that the Eighth District erred in holding this claim barred from review because it was based on evidence outside the record. He also asserts that ineffective assistance of appellate

---

[9]    This claim is also without merit. As stated above, there is no constitutional requirement that a trial court inquire whether a defendant is taking prescribed medication at the time of his or her jury waiver. Moreover, the Eighth District Court of Appeals found that, despite the fact that Otte was taking Mellaril at the time of the jury waiver, he was competent to waive this right. Thus, the trial court's failure to inquire whether Otte was on prescription medication at the jury waiver hearing is inconsequential.

counsel can excuse any waiver of this claim.

The Court finds that Otte has procedurally defaulted this claim.  First, contrary to Otte's assertions, the extent of the trial court's colloquy and explanation of the proceedings is based wholly on the trial record.  Thus, the Eighth District Court of Appeals was correct in barring the claim based on *res judicata*.  Additionally, Otte cannot argue successfully that appellate counsel's failure to raise this claim was tantamount to a Sixth Amendment violation of his right to appellate counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).  Thus, this claim should be foreclosed from habeas review.[10]

### 3. The State trial court lacked jurisdiction to try Petitioner Otte without a jury and violated Petitioner's right to due process of law and a fair trial.

Otte next asserts that the trial court lacked jurisdiction to hear his case because it did not comply with the requirements of Ohio Revised Code § 2945.05.  Specifically, the trial court failed to time stamp the jury waiver form prior to trial.  Otte signed a written waiver of his right to a jury trial on June 25, 1992.  Although the trial commenced on September 16, 1992, the written waiver was not filed until September 22, 1992.  Thus, Otte asserts, the trial court did not comply with § 2945.05 and had no jurisdiction to hear his case.  Consequently, Otte claims, his trial violated his Fourteenth Amendment right to due process of law and the right to a fundamentally fair trial.

The Respondent asserts that this claim is procedurally defaulted because Otte raised it for

---

[10]      This claim also lacks merit.  Many of the sub-issues that Otte raises in his second ground for relief are repetitive of issues raised in the first ground for relief. Moreover, as articulated above, the Constitution does not require the trial court to explain the jury system and its method of obtaining a verdict to constitute a knowing and intelligent waiver.  *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007).

the first time during post-conviction proceedings even though the basis of this claim was part of

the trial record.  On appeal from the denial of post-conviction relief, the Eighth District Court of

Appeals held that the claim is barred by *res judicata*.  *Return*, Apx. Vol. 7, at 258.  Although

Otte asserts that ineffective assistance of appellate counsel can serve as cause and prejudice to

excuse the default, the Eighth District Court of Appeals also found when ruling on Otte's

application to reopen his direct appeal that the claim lacked merit.  Without additional law or

facts to rebut the Eighth District Court of Appeals' decision, this Court must afford that court

the presumption of correctness to which it is entitled under AEDPA review and find that Otte

cannot surmount the procedural default hurdle.

This claim lacks merit in any event.  Ohio Revised Code § 2945.05 sets forth specific

requirements to which trial courts must adhere when accepting a criminal defendant's jury

waiver.  It states:

> **Defendant may waive jury trial.**
> In all criminal cases pending in courts of record in this state, the defendant
> may waive a trial by jury and be tried by the court without a jury.  Such waiver by
> a defendant, shall be in writing, signed by the defendant, and filed in said cause
> and made a part of the record thereof.  It shall be entitled in the court and cause,
> and in substance as follows: "I . . . . . . , defendant in the above cause, hereby
> voluntarily waive and relinquish my right to a trial by jury, and elect to be tried
> by a Judge of the Court in which said cause may be pending.  I fully understand
> that under the laws of this state, I have a constitutional right to a trial by jury."
> Such waiver of trial by jury must be made in open court after the defendant has
> been arraigned and has had opportunity to consult with counsel.  Such waiver
> may be withdrawn by the defendant at any time before the commencement of the
> trial.

Ohio Rev. Code § 2945.05.

The Ohio Supreme Court has issued a number of opinions that directly address the degree

of statutory compliance necessary to effectuate a valid waiver.  In its earlier decisions, some

-39-

Ohio courts did not appear to require strict compliance with § 2945.05.  *See, e.g., State v. Griffin*, 469 N.E.2d 1329, 1331 (Ohio Ct. App. 1979)(holding § 2945.05 does not require open court colloquy or that waiver be made part of record to be presumed valid).  In subsequent decisions, however, the Ohio Supreme Court held strict compliance necessary to uphold the waiver as a valid one.  *See, e.g., State ex rel. Larkins v. Baker*, 653 N.E.2d 701 (Ohio 1995); *State ex rel. Jackson v. Dallman*, 638 N.E.2d 563 (Ohio 1994).  Finally, in *State v. Pless*, 658 N.E.2d 766 (Ohio 1996), the Ohio Supreme Court synthesized its previous strict compliance cases, disregarding earlier opinions that appear not to have required rigid compliance with the statute to effectuate jury waiver.  The *Pless* court held that, "[a]bsent strict compliance with the requirements of R.C. 2945.05, a trial court lacks jurisdiction to try the defendant without a jury." *Id.* at ¶ 1 of the syllabus.  Additionally, it held that a defendant may only obtain a remedy for the trial court's failure to comply with the jury waiver statute on direct appeal.  *Id.* at ¶ 2 of the syllabus.

Otte claims that the *Pless* holding dictates the outcome on this issue.  Because *Pless* requires strict compliance with the statute, the trial court's failure to so comply deprived it of jurisdiction.  Otte maintains that he was deprived of his Fourteenth Amendment right to due process as he was tried by a court that had no jurisdiction to hear his case.

As with his jury waiver claims, the recent Sixth Circuit opinion *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007), is instructive on this issue.   Like the trial court here, the trial court in *Haliym* tried the petitioner's case without the filing of a valid jury waiver.  The *Haliym* petitioner asserted that his appellate counsel were ineffective because they should have raised the jurisdictional issue on appeal.  The *Haliym* court held that counsel were not ineffective because

-40-

counsel could not have anticipated the 1996 *Pless* decision and its finding that strict compliance to the statute was a prerequisite to confer jurisdiction.  *Id.* at 695 (citing *Lott v. Coyle*, 261 F.3d 594, 609 (6th Cir. 2001)).

On similar grounds, Otte's claim that the trial court lacked jurisdiction to hear his case must fail.  During 1992, the time that the trial court heard Otte's case, strict compliance with the statute was not required.  Like appellate counsel in *Haliym*, the trial court here could not have anticipated that the Ohio Supreme Court would require strict compliance with the statute four years after it tried Otte's case.  Accordingly, this claim has no merit.

> **4. Petitioner's rights to due process and a fair trial were violated when [the] State trial court failed to inform Petitioner that jury waiver increased his risk of death.**

Otte asserts in this ground for relief that the Ohio death penalty statutes provide a lower threshold for three-judge panels to find a death sentence is appropriate than they do for judges who make the same decision after a jury trial.  Specifically, he claims that at the time he was tried, Ohio Revised Code § 2929.02(D)(3) required only that a three-judge panel find that the aggravating circumstances outweigh the mitigating factors, without requiring the panel to make such a finding beyond a reasonable doubt.  Conversely, a judge who was considering a death recommendation to a jury could only accept that recommendation if it found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.[11]

The Respondent argues that this claim is procedurally defaulted.  He asserts that, although this claim is based on evidence found in the record, Otte did not raise this claim on

---

[11]     The statute was amended in 1995 to require both a panel and judge presiding over a jury to find that a death sentence is appropriate beyond a reasonable doubt. Ohio Rev. Code § 2929.03(D)(3)(amended 1995).

direct appeal.  Instead, he first argued this claim in the petition for post-conviction relief.  On appeal from the denial of this relief, the Eighth District Court of Appeals held that this claim was barred by *res judicata*.  *Return*, Apx. Vol. 7, at 257.  Otte counters that this claim is based on evidence both on and off the record and should thus not be barred by *res judicata*.  The Court disagrees.  The statutory standard by which a three-judge panel should sentence a capital defendant is not based on evidence outside the record.  Moreover, the standard by which Otte's panel in particular sentenced Otte is part of the trial record.  Thus, Otte's assertion has no merit.

Otte next contends that ineffective assistance of appellate counsel for failing to raise this issue on direct appeal can serve as cause and prejudice to excuse any default.  Once again, the Court finds that Otte's claim has no merit.  Otte raised this claim in his application to reopen his direct appeal.  The Eighth District Court of Appeals held that appellate counsel were not ineffective for failing to raise this issue.  *State v. Otte*, No. 64617, 2000 WL 1900396, at *2 (Ohio Ct. App. Dec. 20, 2000).  Thus, Otte cannot find grounds for the Court to excuse the procedural default of this claim and it therefore will not review the claim on the merits.[12]

> **5. Trial counsel erred in failing to explain to Petitioner the effect a jury waiver would have on his case at trial, sentencing and appeal violating the Petitioner's constitutional rights to due process and a fair trial.**

Otte argues that his counsel were ineffective for failing to inform him about the

---

[12]    Were it to do so, the Court would find that this claim lacks merit.  First, as the Respondent observes, the three-judge panel indicated on the record before sentencing Otte that it "considered the aggravating circumstances that have been proved beyond a reasonable doubt" against the mitigating factors.  *Return*, Tr. Trans. Vol. 2, at 266.  Moreover, even if the trial court imposed the death penalty utilizing an improper standard, the Ohio Supreme Court's re-weighing of the penalty would cure this defect.  *Clemens v. Mississippi*, 494 U.S. 738, 748-49 (1990).

consequences of a jury waiver.  He contends that counsel failed to explain to him that the right to

a jury trial is a personal right that only he could waive.  Otte also maintains that counsel failed to

fully explain that if tried by a jury he would have to convince twelve individuals, rather than

three individuals, that the death penalty was the appropriate sentence.  Finally, he argues that

counsel forced him into waving this right.  Although the Respondent concludes that this claim is

not procedurally defaulted, *Return* at 58, the Court finds otherwise.  On appeal from post-

conviction relief, the Eighth District Court of Appeals held that the trial court had properly

dismissed the ineffective assistance of counsel claim pertaining to Otte's jury waiver.  It held:

> We agree that cause of action five, alleging that Otte's trial lawyers were
> ineffective because they failed to inform him of his rights and the consequences
> of his waiver, and those portions of causes of action two and four that make
> similar claims, were properly dismissed because he did not attach any relevant
> supporting affidavits or evidence to his petition.  Otte does not allege by affidavit
> that his trial lawyers failed to give him proper information concerning his waiver,
> or that he was unable to understand the information given.

*Return*, Apx. Vol. 7, at 255-56.  From the above quote it is apparent that the Eighth District

Court of Appeals was affirming the dismissal of these claims because they were not based on

evidence *de hors* or outside of the record and were therefore insufficient to make out a cause of

action in post-conviction relief proceedings.  Because Otte's claim was not properly raised and

consequently not reviewed on the merits during post-conviction proceedings, the Court finds that

this claim is procedurally defaulted.  *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002).

Regardless of its defaulted status, this claim is not well-taken.  During the post-

conviction evidentiary hearing, trial counsel D'Angelo testified regarding his reasons for

encouraging Otte to waive his right to a jury trial.  He stated:

A.     Based upon the evidence we felt that the State would have no difficulty in

-43-

proving all the elements of the crimes charged, which would then subject Mr. Otte
to potential conviction for the death penalty and a sentence for that.

>    And then we assessed the type of mitigation information that we had and
we felt that that would be best handled by a three judge panel.  And we also took
into account, attorneys make judgments, and one of our judgments was the
parties, that is, the prosecution, prosecuting attorney assigned to the case and the
defense counsel were working hard to try to plead to something other than the
death penalty.

>    And the trial judge tried to bring the parties together to see if that was a
possibility.  And the court got actively involved in that process.  And we just felt
that based upon all the efforts that were made and ultimately who would be on the
panel, we felt we made a judgment that that would be in Mr. Otte's best interest.

>    Judge Gorman had at that time, I believe, he was the only judge, who had
ever overturned a jury's recommendation for a death sentence.  So we felt that
based on all those factors, with these three particular judges, that that would be in
Mr. Otte's best interest.

>    We discussed it with him and urged him to agree to that.

*Return*, Tr. Trans., Vol. 6, at 240-41.  When discussing the other two panel members, Judges
Richard McMonagle and Lesley Brooks Wells, counsel articulated why he believed trying the
case before them would be beneficial to Otte:

>    They both have reputations as being thoughtful, fair judges.  Not necessarily
prone to being quote, tough on criminals, whether they get their, because that's

their judgment, to what the case requires is another story.  But I think their

reputations are well established in the county as being thoughtful, fair judges,

who are compassionate, knowledgeable about the law, and also have a practical

approach to being a judge.

        And we felt that given the facts of the case, the age of our client, and his

background, that we would have the best chance with them.

*Id.* at 244.

       To assert a successful ineffective assistance of counsel claim, a petitioner must satisfy the

familiar two-prong test for ineffective assistance of counsel claims set forth in *Strickland v.*

*Washington*, 466 U.S. 668 (1984).   First, the petitioner must demonstrate counsel's errors were

so egregious "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment."  *Id.*  Second, the petitioner must show he or she was prejudiced by counsel's

errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant

of a fair trial, a trial whose result is reliable."  *Id.*

       A petitioner must point to specific errors in counsel's performance.  *United States v.*

*Cronic*, 466 U.S. 648, 666 (1984).   Thereafter, a reviewing court must subject the allegations to

rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or

omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466

U.S. at 690.  A reviewing court must strongly presume counsel's conduct was reasonable and

might be part of a trial strategy.  *Id.* at 689.   "'Judicial scrutiny of a counsel's performance must

be highly deferential'" and  . . . 'every effort [must] be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

-45-

conduct from counsel's perspective at the time.'"  *Cone v. Bell*, 535 U.S. 685, 698

(2002)(quoting *Strickland*, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a

reviewing court does not speculate whether a different strategy might have been more successful,

but a court must "focus[] on the question whether counsel's deficient performance renders the

result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506

U.S. 364, 372 (1993).

Here, trial counsel articulated that the reasons for advising Otte to waive his right to a

jury trial were based on the prosecution's evidence demonstrating that Otte committed the

crimes, the efforts by the prosecutor and the trial court to arrange a plea agreement with defense

counsel, and the reputation of the judges who defense counsel knew would comprise Otte's

three-judge panel.  Thus, counsel's decision to advise Otte to waive a jury trial was based on

counsel's studied review of the facts of the case and knowledge regarding the individual judges

who would convict and/or sentence Otte.  As the *Strickland* Court held, a reviewing court must

"apply[] a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.

Counsel formed their opinion regarding whether it was to Otte's benefit to waive the right to a

jury trial only after a careful assessment of Otte's circumstances.  *Strickland* requires nothing

further.  Counsel were not ineffective merely because they incorrectly concluded that the three-

judge panel would not sentence Otte to death.

Moreover, other than Otte's mere assertion that counsel failed to explain the

consequences of his decision to waive a jury trial, there is no evidence in the record to support

this claim.  As quoted above, counsel stated on the record during the jury waiver hearing that he

had explained to Otte the rights he was relinquishing.  Without more than Otte's bald allegation that counsel did not do so, the Court holds that Otte has failed to meet the burden of demonstrating that counsel's conduct was objectively unreasonable to his detriment under *Strickland*.  The Court finds that this claim has no merit.[13]

> **6. The cumulative effect of the anti-psychotic medication, the trial court's failure to explain, the trial attorneys' failure to explain and the Petitioner's low I.Q. caused the Petitioner's waiver not to be knowing, voluntary and intelligent violating the Petitioner's right to due process and a fair trial.**

Otte's final claim pertaining to the jury waiver issue is that the cumulative effect of all the errors surrounding his decision to waive a trial by jury rendered his trial fundamentally unfair and deprived him of the right to due process.  In *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006), the Sixth Circuit acknowledged that "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Id.* at 816 (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir.2005)).[14]  *See also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006)(holding that while errors might accumulate to produce unfair trial setting, Supreme Court has never held distinct claims can accumulate to grant habeas relief); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *and cert. denied at*, 538 U.S. 947 (2003)(same).

---

[13]    In the Petition, Otte asserts that discovery is necessary to develop this claim fully. *Petition*, at 35.  The Court does not agree.  Otte presented evidence on this issue during a two-day hearing in his state post-conviction proceedings.  He is hard pressed to assert at this juncture that he was permitted insufficient opportunities to present the facts supporting this claim.

[14]    The Court notes that, in another case, the Sixth Circuit granted habeas relief on cumulative error grounds.  *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003).  Because the *DePew* petitioner had filed his petition prior to the AEDPA's effective date, however, the AEDPA provisions did not apply. *Id.* at 748.

Accordingly, this claim is not well-taken.

> **7. Petitioner's convictions and sentence are void and or voidable because Petitioner did not have the mental capacity to make a knowing, voluntary and intelligent waiver of his right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution.**

Otte maintains the police who questioned him while in custody violated his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), because Otte had ingested significant amounts of alcohol and drugs prior to confessing his crimes to the police and, thus, his waiver of his *Miranda* rights was not knowing, voluntary, and intelligent. Defense counsel filed a motion to suppress Otte's confession, asserting his *Miranda* waiver was invalid. The trial court thereafter held a suppression hearing on this issue, but denied Otte's motion. Otte raised this claim as his second proposition of law to the Ohio Supreme Court. Thus, it is ripe for habeas review and the Court will address it on the merits.

Although *Miranda* proscribes custodial investigations without informing the accused of his right to retain counsel before interrogation and the right to remain silent, the accused may waive those rights if that waiver is knowing, voluntary, and intelligent. *North Carolina v. Butler*, 441 U.S. 369, 374 (1979). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

On appeal, the Ohio Supreme Court determined that, pursuant to *Miranda* and its progeny, Otte had voluntarily waived his *Miranda* rights. That court stated:

> In his second proposition of law, Otte contends that his confession statements to the police on February 14 and 16 should have been suppressed because the state failed to show they were voluntary.

-48-

On February 13, the date he was arrested, Otte was questioned by Det. Bomba. Bomba read Otte his *Miranda* rights, which Otte indicated he understood. Otte denied any involvement in the murders and claimed he hadn't been at the Pleasant Lake apartment complex on February 12 and 13.

The next day, February 14, Det. DeSimone questioned Otte. DeSimone testified that Otte seemed calm and composed, was not shaking, showed no withdrawal symptoms, did not complain of illness, and did not appear to be under the influence of drugs or alcohol. DeSimone read Otte his Miranda rights, Otte indicated he understood his rights, then waived them. Otte next made an oral confession, which DeSimone tape-recorded. DeSimone testified that he made no promises or threats. After confessing, Otte asked DeSimone "what he could get"; DeSimone told him he could get the death penalty, but never said he could avoid it by confessing.

On February 16, DeSimone questioned Otte again after reading him the *Miranda* warnings and getting a written waiver. Otte did not appear to be under the influence. DeSimone wrote Otte's statement down, and Otte signed it. This statement was consistent with his February 14 confession. On February 20, Otte asked to speak to DeSimone again. DeSimone again advised him of his rights; Otte waived them and made a statement clarifying his February 16 confession.

At the suppression hearing, Otte testified that he had consumed "a half gallon to a gallon" of whiskey and $300-$400 worth of crack cocaine during the twenty-four hours preceding his February 13 arrest; on the day of the arrest alone, he claimed he had "three-fourths of a fifth" of whiskey, "a couple [of] joints," and $75 to $125 worth of crack, some of which he smoked ten to fifteen minutes before his arrest.

Otte testified that, during the February 14 interrogation, he admitted that "I did the crime" and asked "what was I going to get. And they said the death penalty." According to Otte, DeSimone said that they had enough evidence to arraign him, but if Otte helped the detectives, "they would help me out and I wouldn't get the death penalty."

Otte conceded that, during the February 14 interrogation, he was sober, but testified that he was in withdrawal, had blurred vision, and could not "think through what I was actually saying." He claimed he was "shaky from drinking," but also said he was "shaky because of what I was arrested for."

Otte testified that on February 15, he vomited blood and "couldn't stop shaking." Police took him to a hospital. A doctor diagnosed withdrawal, and Otte was given medication. Otte testified that hospital personnel told him he was having "DT's" (delirium tremens). However, an emergency room report introduced by Otte

-49-

himself said that he "denie[d] any vomiting or bleeding" and was not undergoing delirium tremens.

Otte testified that he confessed because, "first of all I felt bad." He added that he also confessed because DeSimone told him he could avoid the death penalty, and that he "didn't understand what was actually going on."

Otte claims the state failed to prove his waivers and statements were voluntary. A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484; *State v. Dailey* (1990), 53 Ohio St.3d 88, 559 N.E.2d 459, paragraph two of the syllabus.

In support of his claim that his confessions were not voluntary, Otte points to his alleged intoxication, but we have only Otte's word for the amount of whiskey and drugs he consumed on February 13; Det. Bomba testified that Otte did not appear to be under the influence that night. Otte claims he was suffering from withdrawal on February 14, but DeSimone saw no symptoms, and Otte answered "no" when asked during the February 14 confession if he was presently under the influence of alcohol or drugs. Otte claims DeSimone promised to save him from the death penalty, but DeSimone denied that. Moreover, Otte's claim of physical deprivation or mistreatment is meritless. *See State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. His own testimony shows that police took him to the hospital when he told them that he was sick. Nor do the "length, intensity, and frequency of interrogation" suggest involuntariness. *Id.* Otte was interrogated for two hours on the night of the arrest, when he denied guilt. He was not interrogated again until 4:00 p.m. the next day, and then for less than an hour. He was not interrogated again until 9:00 a.m., February 16, two days later. He did not speak to police again until February 20, in a brief conversation that he initiated.

Otte's second proposition of law lacks merit.

*State v. Otte*, 660 N.E.2d 771, 718-19 (Ohio 1996).

During post-conviction proceedings, Otte supplied the report and affidavit of Dr. Charles T. Kandiko, a pharmacologist who examined Otte during post-conviction proceedings. Dr. Kandiko concluded in his report that Otte was addicted to cocaine and alcohol, that he was under the influence of those drugs when he was initially interviewed by police following his arrest, and

-50-

that he was suffering withdrawal symptoms from the drugs when he confessed to police the

following day.  *Return*, Apx. Vol. 6, at 191-98.  Additionally, Otte adduced testimony from Dr.

Robert Smith during the post-conviction evidentiary hearing.  Dr. Smith stated that because Otte

was suffering from drug and alcohol withdrawal, he was unable to make a knowing and

intelligent waiver of his rights.  *Return*, Apx. Vol. 6, at 22.  He testified that individuals suffering

from withdrawal are susceptible to police pressure.  Based on his experience with people

undergoing drug and alcohol withdrawal who will sign "just about anything put in front of

them," Dr. Smith concluded that Otte's withdrawal symptoms would have made him very

uncomfortable and therefore unable to rationally forego his *Miranda* rights.  *Id.* at 34-6.

Otte submits that Dr. Kandiko's report, along with the testimony of Dr. Smith,

demonstrates his inability to knowingly and voluntarily waive his *Miranda* rights.  The Eighth

District Court of Appeals disagreed with Otte's assertions.  It held on appeal from post-

conviction relief that Otte's claim had no merit as follows:

> Evidence of police coercion is a necessary prerequisite to a finding that a
> confession was involuntary or that a waiver of rights was not made knowingly,
> intelligently, and voluntarily. *State v. Hill* (1992), 64 Ohio St.3d 313, 318, 595
> N.E.2d 884; *State v. Combs* (1991), 62 Ohio St.3d 278, 285, 581 N.E.2d 1071.
> "The court has adhered to this rule despite arguments by defendants that their
> confessions or waivers were involuntary due to their low mental aptitude or
> mental retardation, or ingestion of drugs or alcohol." *State v. Eley* (Dec. 20,1995),
> Mahoning App. No. 87 C.A. 122, affirmed by 77 Ohio St.3d 174, 672 N.E.2d
> 640.
>
> Physical abuse, threats, or deprivation of food, medical treatment or sleep are
> some "inherently coercive tactics" which, if present in a case, will render a
> confession or a waiver involuntary. *Id.*, citing *State v. Cooey* (1989), 46 Ohio
> St.3d 20, 28, 544 N.E.2d 895; *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527
> N.E.2d 844.
>
> Following his arrest, Otte made statements to the police on three separate dates
> when he confessed in detail. Otte contends that his addictions and withdrawal

symptoms prevented him from making a knowing, intelligent, and voluntary waiver of his Miranda rights prior to giving these statements. He presented various police documents and the testimony of Dr. Smith, a clinical psychologist, at the evidentiary hearing. Dr. Smith relied on Parma Hospital records of Otte's reported drug and alcohol intake and police records documenting the time of his arrest to conclude when Otte would have begun to experience withdrawal. Dr. Smith detailed the effects of withdrawal on an addict in general. He concluded that Otte was experiencing withdrawal as he was taken to the hospital and prescribed medication. Dr. Smith coupled this with Otte's repeated conversations with police to suggest that Otte was extremely susceptible to police coercion to confess to the murders. Therefore, Dr. Smith concluded that Otte's statements were the result of coercion. He then explained Otte's detailed confessions as being Otte's reconstruction from what the police told him. Dr. Smith explained this as a phenomenon common in substance abusers to compensate for periods of black out. He opined that Otte was incapable of waiving his rights because of withdrawal. On cross-examination, however, Dr. Smith acknowledged that patients suffering from withdrawal symptoms do sign consent forms when they enter his treatment facility.

The State offered the testimony of Dr. Resnick who concluded that Otte made knowing, intelligent, and voluntary waivers of his Miranda rights on all of the days he made statements.

Dr. Resnick found Otte was capable of entering knowing waivers by virtue of his I.Q. level, which was beyond mental retardation range. He reviewed hospital records and Otte's testimony from his suppression hearing on June 25, 1992 where Otte acknowledged that he understood his *Miranda* rights and that he waived them prior to his statements. Otte was capable of an intelligent waiver due to a lack of evidence to suggest otherwise. Dr. Resnick explained withdrawal symptoms can range from mild to severe and he felt the records indicated that Otte's were mild. In addition, Dr. Resnick pointed to the testimony of the police officers who described Otte as calm, cool, and collected. The officers did not observe Otte shaking. In Dr. Resnick's opinion, Otte's signatures on the waivers were clear and did not show signs of shakiness. The records also indicate that Otte was prescribed 25-50 milligrams of Librium for his withdrawal but consistently received only 25 milligrams despite the discretion to give him more. Otte also offered a rational motive for giving his confessions, *i.e.*, hopes of avoiding the death penalty.

Dr. Resnick concluded the statements were voluntary because Otte did not complain of drug cravings. There is no evidence that Otte was either threatened or that any treatment was withheld as a means to induce Otte's statements.

Finally, Dr. Resnick disagreed with Dr. Smith's report because it failed to tie the

possible symptoms of withdrawal with any definitive evidence that Otte suffered from those symptoms. He felt Dr. Smith's opinion merely theorized the presence of the symptoms as opposed to showing the actual presence of the symptoms when Otte made his statements.

The trial court found that Otte's waivers were valid, notwithstanding the additional expert opinion on drug and alcohol addiction and withdrawal, and therefore trial counsel was not ineffective for failing to obtain such an expert. The trial court based this decision on a review of the record, the Ohio Supreme Court's opinion that addressed Otte's claims that intoxication and subsequent withdrawal rendered his confessions involuntary, and Dr. Resnick's opinion that Otte was capable of making a voluntary waiver of his Miranda rights even if he was experiencing withdrawal symptoms. Thus, we reject Otte's contention that the trial court failed to consider the evidence presented at the evidentiary hearing. Just because Otte presented conflicting evidence does not mean that the evidence the court relied upon was other than competent and credible. The trial court was not required to engage in an elaborate and lengthy discussion in its findings of fact and conclusions of law but only to make findings sufficiently comprehensive and pertinent to the issue to form a basis upon which the evidence supports the conclusion. *Ibid.*

We find the trial court's decision was based on competent, credible evidence and accordingly Assignment of Error I is overruled.

*State v. Otte*, No. 84455, 2005 WL 77071, at *6-7 (Ohio Ct. App. Jan. 13, 2005)(footnote omitted).

Despite Otte's summary assertion to the contrary, the Ohio courts' application of *Miranda* and its progeny was not unreasonable. Citing the state analogues to the United States Supreme Court's opinion in *Colorado v. Connelly*, 479 U.S. 157, 164 (1979), the Ohio Supreme Court held that a necessary predicate to finding a *Miranda* violation is the presence of coercive police conduct. The Ohio Supreme Court reviewed the circumstances of the Parma Police Department's interviews with Otte and found that there were no instances of police coercion.

The Eighth District Court of Appeals also found that Otte could not establish that his *Miranda* waiver was not knowing, voluntary, and intelligent. Although Otte presented the

-53-

testimony of Dr. Smith during the hearing and the report from Dr. Kandiko, the Eighth District

Court of Appeals found that it was reasonable to credit the conclusions of the State's witness, Dr.

Resnick, as well as the observations of the police detectives who interviewed Otte at the time of

the arrest in holding that Otte could not establish that he was under the influence of drugs or

alcohol or symptoms of withdrawal from them to render his *Miranda* rights involuntarily

surrendered. These well-reasoned decisions are precisely what the AEDPA requires this Court

to defer to when conducting its habeas review. Accordingly, the Court finds that this ground for

relief has no merit.

> **8. Trial counsel erred in failing to introduce any expert evidence relative to the effects of alcohol and crack cocaine on Petitioner's ability to make a voluntary, knowing and intelligent waiver of his Fifth Amendment right to due process and a fair trial.**

> **9. Trial counsel erred in not requesting an independent pharmacologist or toxicologist to assist counsel at all phases of trial violating Petitioner's right to due process and a fair trial.**

In these grounds for relief, Otte asserts that trial counsel were ineffective for failing to

obtain a pharmacologist or toxicologist to assist them at all phases of trial. He maintains that

these experts could have delineated for the panel the effects that Otte's heavy drinking and

cocaine use had on his ability to make rational judgments and inability to control his aggression.

He claims that hiring these experts would have altered the outcome of the suppression hearing,

would have permitted him to question whether he possessed the intent necessary to convict him

of aggravated murder, and would have served as a mitigation factor or factors during the

sentencing phase of trial. Otte raised these claims in his state post-conviction proceedings and

the courts addressed them on the merits. These claims are therefore preserved for federal habeas

review.[15]

As stated above, to prevail on an ineffective assistance of counsel claim, Otte must

demonstrate that counsel's errors were so egregious that "counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466

U.S. 668 (1984). Second, he must show that he was prejudiced by counsel's errors. "This

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a

trial whose result is reliable." *Id.*

### a. Grounds for Relief 8 and 9(a) - ineffective assistance at pre-trial phase

In these grounds for relief, Otte asserts that counsel were ineffective for failing to hire a

toxicologist or pharmacologist to testify during the suppression hearing regarding his confession

---

[15]     The Respondent asserts that portions of Otte's ninth ground for relief may
be procedurally defaulted if Otte failed to raise them precisely as he did in state
court. While the Court recognizes that the Sixth Circuit has held that a habeas
claim is exhausted only if it is raised under the same theory in federal court as it
was in state court, *Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002), courts
have held that mere variations of the same claim that do not go so far as to present
a new legal theory or wholly uncharted factual allegations will not preclude a
habeas court's finding that exhaustion has occurred. *Chambers v. McCaughtry*,
264 F.3d 732, 738 (7th Cir. 2001); *Caballero v. Keane*, 42 F.3d 738, 740-41 (2d
Cir. 1994).
        Here, Otte has claimed that counsel's failure to hire experts altered the
outcome of the culpability phase of trial because Otte's drug use rendered him
incapable of forming the requisite intent for conviction. In state court, Otte
argued that counsel's failure to hire these experts could have changed the
outcome of the culpability phase of trial because he could not assert a not guilty
by reason on insanity defense. *Return*, Apx. Vol. 6, at 56-68. While there is a
distinction between these two theories, the factual allegations raised to present
these claims to the Court are identical. Thus, the Court finds that the claim Otte
presents here is a mere variation of the claim he presented in state court and is
therefore exhausted for purposes of habeas review.

-55-

and *Miranda* waiver.  The Court already has reviewed the factual underpinnings of this claim

and found that the Ohio courts' conclusion that Otte knowingly and voluntarily waived his

*Miranda* rights, even though he was under the influence of drugs and alcohol, was not clearly

contrary to any United States Supreme Court precedent.  Accordingly, Otte cannot establish the

prejudice necessary to succeed on this claim.   The Court therefore finds that this claim is not

well-taken.  *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)("If [a petitioner] fails

to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims

must fail")(quoting *Strickland*, 466 U.S. at 697).

### b. Ground for Relief 9(b) - ineffective assistance during culpability phase of trial

Otte next argues that trial counsel should have retained pharmacology and toxicology

experts during the culpability phase of trial to assist them in formulating their defense.  He

maintains that these experts could have aided counsel by demonstrating that Otte's drug and

alcohol use at the time the crimes were committed rendered him unable to form the requisite

intent necessary to be convicted of aggravated murder.  Otte raised this issue in his post-

conviction petition.  Although the post-conviction court held that the claim was barred by *res*

*judicata*, the Eighth District Court of Appeals held that the issue of counsel's ineffectiveness and

expert reports regarding the effects of intoxication could only be determined by evidence *de hors*

or outside the record.  Accordingly, the Eighth District remanded this portion of the post-

conviction court's findings.  After the evidentiary hearing, neither the post-conviction court nor

the Eighth District Court of Appeals specifically addressed this aspect of Otte's claim.  Thus,

while Otte has exhausted the claim and the Ohio courts presumably have found it to be without

merit, there is no reasoned opinion to which this Court can defer regarding ineffective assistance

-56-

during the culpability phase of trial.  The Court must therefore review Otte's claim *de novo*.

*Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).

The Court finds that Otte cannot argue successfully that counsel were deficient during the culpability phase of trial.  First, as the Respondent observes in his return of writ, the Ohio Supreme Court found when it ruled on Otte's sufficiency of the evidence claim that, despite evidence of Otte's intoxication, the prosecution produced enough evidence during trial to infer Otte's purposeful conduct.  *State v. Otte*, 660 N.E.2d 711, 720 (Ohio 1996).  Specifically, it found that there was no reference in the record to the amount of drugs consumed prior to the Wasikowski murder, despite Otte's detailed account of his drug ingestion between the two murders.  Moreover, the Ohio Supreme Court held that Otte "evidenced clearheadedness by concocting a story to tell Wasikowski, turning up the TV to drown out Wasikowski's cries, and leaving through the patio door."  *Id.*  The court also found evidence of Otte's intent to kill Kostura because he told police he shot her because she screamed and he "got paranoid."  *Id.*

The above facts underscored by the Ohio Supreme Court demonstrate that, even if trial counsel had introduced the testimony of a pharmacology and/or toxicology expert to demonstrate the effects of the drugs on Otte's ability to form intent, the panel likely would have convicted Otte of the murders.  Expert testimony regarding the effects of cocaine and alcohol would not have affected the outcome of the panel's decision when there was no evidence regarding the amount of these drugs Otte ingested prior to the Wasikowski murder.  Similarly, their testimony likely would not have influenced the panel's decision because of the evidence the prosecution presented regarding Otte's attempts to escape detection of the crimes after he committed them, which demonstrates Otte's ability to react in the minutes after he murdered the victims.  Finally,

Otte provided lengthy testimony at the suppression hearing before one of the panel members regarding his state of intoxication prior to and after the Kostura murder.  Thus, the panel may have viewed expert opinion regarding this same issue as cumulative.  Otte cannot assert counsel's failure to act prejudiced the outcome of the culpability phase of trial under *Strickland*.  Accordingly, the Court finds that Otte's assertion that defense counsel were ineffective for failing to hire a pharmacologist and/or a toxicologist is not well-taken.

### c. Ground for relief 9(c) - ineffective assistance during penalty phase of trial

Otte asserts here that trial counsel should have presented expert testimony regarding Otte's drug and alcohol use during the penalty phase of trial.  He claims that, had counsel supplied this testimony, the panel could have found that it established the presence of the duress mitigating factor.[16]  He also maintains that even if the panel would not have found Otte's drug and alcohol use established duress, it would have considered it under the "catch-all" mitigating factor found in Ohio Revised Code § 2929.04(B)(7).[17]  Otte raised this claim during post-conviction proceedings and the Eighth District Court of Appeals addressed it on appeal from the denial of post-conviction relief.  Thus, this claim is ripe for habeas review.

In its opinion, the Eighth District Court of Appeals affirmed the trial court's dismissal of this claim.  It held:

---

[16]     This factor states that a jury or three-judge panel can consider as a mitigating factor: "[w]hether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation." Ohio Rev. Code § 2929.04(B)(2).

[17]     That factor allows the jury or panel to consider any evidence not enumerated in the previous factors as a mitigating factor.  Ohio Rev. Code § 2929.04(B)(7).

Additionally, Otte contends trial counsel was ineffective by not retaining and presenting expert evidence concerning his substance abuse disorder in mitigation.

Otte presented the expert testimony of Dr. Smith whose opinion was that Otte suffered from drug and alcohol addiction that influenced his actions in committing the underlying crimes. Otte contends that trial counsel should have offered this type of evidence at the penalty phase.

We construe the State's two-fold response as follows: (1) the facts surrounding the murders and Otte's confessions indicate he was not so impaired by his addictions in committing these murders to consider it much of a mitigating factor regardless of an expert opinion; and (2) the panel's awareness of Otte's reported addictions undermine a claim that counsel was ineffective for not calling an expert witness to elaborate on the medical implications of such addictions.

The trial court found that the three-judge panel was aware of Otte's claimed intoxication and substance abuse and still imposed the death penalty. The trial court concluded that the impact, if any, of expert testimony on the pharmacological effects of such use and addiction was merely speculative.

It is well settled that alcoholism and other addictions are given little weight in the sentencing phase. *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916, citing *State v. Morales*, 32 Ohio St.3d at 261, 513 N.E.2d 267; *State v. Hicks* (1989), 43 Ohio St.3d 72, 80, 538 N.E.2d 1030; *State v. Lawson* (1992), 64 Ohio St.3d 336, 352, 595 N.E.2d 902. Consistent with this precedent, the Ohio Supreme Court in Otte's direct appeal indicated its regard of drug and alcohol use a weak mitigating factor. *State v. Otte* (1996), 74 Ohio St.3d 55.FN2 No court that has addressed this matter has ever questioned the validity of Otte's reported drug and alcohol abuse. Therefore, expert testimony was not needed to establish its existence.

> FN2. It is also important that "a court is not necessarily required to accept as mitigating everything offered by the defendant and admitted. Nor is the court automatically required to give such admissible evidence any weight. *State v. Steffen* (1987), 31 Ohio St.3d 111, 509 N.E.2d 383, paragraph two of the syllabus." *State v. Eley* (1996), 77 Ohio St.3d 174, 672 N.E.2d 640 (affirming death sentence despite evidence of defendant's dysfunctional family, substance abuse, and low intellect and noting that others with similar backgrounds have grown up as law-abiding citizens).

Otte presents us with no case law to suggest that the addition of expert testimony at the penalty phase on this topic could somehow increase the mitigating weight of this factor. Accordingly, Otte did not prove that trial counsel's conduct in failing to present an expert on substance abuse at the penalty phase was either deficient or resulted in an unfair trial.

*State v. Otte*, No. 84455, 2005 WL 77071, at *5 (Ohio Ct. App. Jan. 13, 2005).  The Eighth

District's reasoning is not clearly contrary to the *Strickland* holding.  It found that Otte's

assertion that the panel would have come to a different sentencing decision had it heard the

testimony of an expert was sheer supposition.

   The Sixth Circuit held in *Slaughter v. Parker*, 450 F.3d 224 (6th Cir. 2006), that while

trial counsel acted unreasonably because he failed to investigate thoroughly for mitigating

evidence, the petitioner was not prejudiced by that failure because much of the information the

petitioner asserted was omitted was actually adduced in the penalty phase by the petitioner's own

testimony.  In denying the petitioner's claim on this ground, the *Slaughter* court held that "there

is an insufficient showing of prejudice where 'one is left with pure speculation on whether the

outcome of the trial or the penalty phase could have been any different.'"  *Id.* at 234 (quoting

*Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004)).

   Here, as in *Slaughter*, Otte does not demonstrate the prejudice he must in order to prevail

under *Strickland*.  He asserts that an independent pharmacologist or toxicologist would have

explained how his drug addictions actually mitigated his conduct and impaired his functioning

during the commission of the crimes.  However, Dr. Sandra McPherson testified during trial

about Otte's history of drug and alcohol abuse beginning at age ten.  *Return*, Tr. Trans., Vol. 2,

at 176.  Moreover, Otte testified in his unsworn statement that drugs had "ruined [his] life."  *Id.*

at 248.  Thus, the panel was aware of Otte's extensive drug usage.  Like the *Slaughter* petitioner,

Otte cannot demonstrate that any failure to act on counsel's part was prejudicial to the outcome

of the mitigation hearing.  Accordingly, the Court finds that the Eighth District Court of

Appeals' decision to find this claim without merit was not an unreasonable application of

*Strickland.*  This claim is not well-taken.

> **10. Petitioner was denied his constitutional right to effective assistance of counsel during the trial and guilt phase of his trial in the State of Ohio trial court.**

In this ground for relief, Otte alleges several instances of trial counsel's ineffectiveness during the culpability phase of trial as follows: (a) counsel waived opening argument until the beginning of the defense's case but never made any opening argument; (b) counsel did not cross-examine five out of seven of the State's witnesses; (c) trial counsel made a "less than perfunctory" motion to dismiss the case pursuant to Ohio Rule of Criminal Procedure 29(A); (d) trial counsel's closing argument was inadequate; (e) counsel presented no evidence during the guilt phase of trial; (f) counsel stipulated to the admission of Otte's fingerprint found outside Kostura's apartment; (g) counsel had no defense theme; (h) counsel failed to emphasize the prosecution's burden of proof; (i) counsel failed to present expert testimony about Otte's drug and alcohol use relating to the *Miranda* waiver and his ability to form the intent necessary to be convicted of the crime.

Initially, the Court observes that sub-claim (i) is a repetition of the ninth ground for relief, sub-claim (c).  Because the Court reviewed that claim above, it will not re-address it here.

Several of Otte's sub-claims are procedurally defaulted because he never presented them at any juncture of his state court proceedings.  Thus, the Court finds Otte has procedurally defaulted sub-claims (a), (c), (d), (g), and (h).  Although Otte argues that he incorporated these claims by reference in his fifteenth cause of action in the post-conviction relief petition by asserting cumulative error, a brief review of that petition confirms the Respondent's assertion that Otte made no such assertion in that claim.  Instead, Otte asserted in his fifteenth cause of action that his convictions and sentence "are void or voidable because the three judge panel

-61-

failed to consider the mitigating factor of [his] good behavior and successful adjustment to prison life during his incarceration." *Return*, Apx. Vol. 6, at 74.  Thus, the Court finds that Otte cannot surmount the procedural bar to these claims and it therefore will not review them on the merits.[18]

Similar to Otte's procedurally defaulted claims, the Court finds the non-defaulted sub-claims are not well-taken because Otte fails to support his assertions with any details.  For example, in sub-claim (b), Otte contends that counsel were ineffective for failing to cross-examine five of the State's seven witnesses.  He does not specify, however, why this was unreasonable under *Strickland* by reviewing the testimony of each witness and setting forth how counsel should have cross-examined them.  Moreover, he does not state how counsel's failure to cross-examine these witnesses prejudiced the outcome of his trial.  Sub-claim (e) suffers from the identical defect.  Otte states only that counsel presented no evidence at the guilt phase but does not state why this action was unreasonable or set forth what information counsel should have, but chose not to present during trial that would undermine the confidence in its outcome.  While Otte may be attempting to assert that these failures to act are *per se* Sixth Amendment violations, he provides the Court with no authority to support this supposition.  Accordingly, the Court finds no merit to these sub-claims.

Finally, Otte cannot reasonably argue, as he does in sub-claim (f), that counsel were deficient for stipulating that his fingerprint was on Kostura's door.  There is no evidence in the record to suggest a misidentification of this fingerprint.  Moreover, once counsel's suppression

---

[18]    These claims are not well-taken in any event.  They primarily consist of bald assertion without providing details to support them.

-62-

motion was denied and Otte's confession to Kostura's murder was ruled admissible, counsel's

decision to stipulate to his fingerprint on her door was not a deficient one.  Because of his

confession, any decision by counsel not to stipulate to this evidence would have had absolutely

no affect on the trial's outcome.  Thus, the Court finds that this sub-claim has no merit.

>    **11. Trial counsel failed to adequately investigate mitigating evidence, present
>    mitigation evidence and failed to provide effective assistance of counsel at the
>    mitigation phase of his death penalty trial.**

Otte claims in ground eleven that his counsel were ineffective on several occasions

during the penalty phase of trial as follows: (a) counsel failed to investigate his background and

social history; (b) counsel never sought a continuance for the penalty phase of trial even though

their mitigation specialist, Pat Snyder, was hospitalized prior to trial and remained unable to

testify during the trial; (c) counsel failed to develop mitigation evidence that was available to

them; (d) counsel failed to present Otte's school records during the mitigation hearing; (e)

counsel ignored the mitigation evidence prepared by Snyder and presented only the testimony of

Dr. McPherson and Otte's parents; and, (f) counsel did not argue that a lengthy consecutive

prison sentence could allay the panel's concerns about Otte's potential release.

The Respondent asserts that sub-claim (f) is defaulted because Otte failed to raise it at

any juncture of his state court appeals.  Otte does not assert cause and prejudice to excuse this

default.  Thus, the Court will not review this claim on the merits.[19]  The Respondent concedes

that Otte has preserved the remaining sub-claims for habeas review.

---

[19]     This claim would not be well-taken even if preserved for federal habeas review.
Otte would be hard pressed to prove that a panel of three judges was not already
aware that if they sentenced him consecutively his chances of prison release
would be diminished.

### a.  Sub-claims (a) and (c) - failure to investigate and develop mitigating evidence

Otte asserts that counsel never investigated or failed to investigate fully mitigation evidence available to them.  He claims that a number of witness who were willing to testify about the difficulties Otte experienced in his younger years were never contacted by defense counsel.  Specifically, he contends that counsel did not review his school records or records from the "Covered Bridge School District," which indicated that he had early psychological problems, learning disabilities, and eventual emotional problems.  He also claims that counsel failed to develop evidence that would have demonstrated that, despite his victimization in the classroom, Otte remained passive and was not a discipline problem.  His upbringing in a Mormon family and its religious practices led to his parents' inability to comprehend his drug and alcohol problems and to his inability to adjust to the Mormon community in Terre Haute, Indiana. Finally, he asserts that counsel failed to investigate his adjustment and positive school performance in a school that provided counseling and social services.  Had counsel investigated these aspects of his mitigation profile, Otte maintains, the panel would not have sentenced him to death.

The United States Supreme Court held in *Wiggins v. Smith*, 539 U.S. 510 (2003), that counsel's failure to investigate and present to the jury mitigating evidence was unreasonable. There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.   The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to *Strickland*.

-64-

The *Wiggins* Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.  While *Strickland* established that strategic decisions generally are not subject to challenge, the *Wiggins* Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation. *Id.*

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rompilla v. Beard*, 545 U.S.374, 390 (2005)(internal quotation marks and citations omitted); *Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006).

Following the *Wiggins* Court's example, the Sixth Circuit held in *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003), that courts must review trial counsel's actions in light of the American Bar Association's guidelines.  Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and employment history, as well as obtaining a family and social history through, *inter alia*, contact with family members. *Id.* at 487 n.2.  The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . . . ." *Id.*

The Ohio Supreme Court reviewed Otte's claims on direct appeal but did not offer much by way of analysis.  After reviewing the mitigation evidence counsel actually presented during the penalty phase, the court concluded, "'it may be * * * that counsel conducted a diligent

investigation, but was simply unable to find [more] substantial mitigating evidence.'" *State v. Otte*, 660 N.E.2d 711, 722 (Ohio 1996)(quoting *State v. Hutton*, 559 N.E.2d 432, 441 (Ohio 1990)).  The Eighth District Court of Appeals, having the benefit of depositions of the witnesses who would have testified during trial, reviewed their purported testimony and found that Otte could not establish that counsel's decision not to introduce it during trial was unreasonable because some of it may have been viewed as damaging by the three-judge panel.

The Eighth District Court of Appeals' analysis, while addressing Otte's failure to present mitigating evidence sub-claims, does not appear to address his claim that counsel failed to discover, or discover fully, this evidence in the first instance.  Thus, the Court reviews these sub-claims *de novo*.  *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  In so doing, the Court finds that Otte cannot argue successfully that counsel was unaware of the majority of information Otte asserts would have altered the outcome of the mitigation hearing.  In fact, much of the evidence of which Otte alleges counsel were unaware was actually presented during the mitigation hearing.  Dr. McPherson testified during the penalty phase of trial that Otte was diagnosed as being "hyperactive, as having a learning disability, [and] attention problems." *Return*, Tr. Trans., Vol. 2, at 173.  Counsel also elicited testimony from Dr. McPherson that Otte began abusing drugs by age ten and that he previously had attempted suicide.  She depicted Otte as a child who had several surgeries for chronic ear infections that led to developmental delays and stuttering, about which his classmates would tease him at school.  *Id.* at 174.  Thus, counsel were aware of some of the troubles Otte faced during his formative years.  Dr. McPherson also testified about Otte's apparent success at an institution called Gibault, which provided him with an extremely structured environment where Otte thrived.  *Id.* at 176.  She stated that because of

his success, however, he was placed in a halfway house that provided less structure.  In this decreased structural environment, she testified, Otte "rather quickly deteriorated into the using lifestyle again."  *Id.* at 177.

While there is other evidence Otte asserts counsel did not investigate or investigate fully, these accusations appear to have no factual basis.  As is discussed below in Otte's failure to present mitigating evidence sub-claims, it appears that counsel in fact knew about much, if not all of the mitigating evidence Otte asserts counsel failed to investigate, but chose not to present it during the penalty phase of trial.  Thus, for reasons discussed both above and below, the Court finds that Otte cannot argue counsel was unaware of any significant mitigating evidence.  Accordingly, it finds that counsel did not act unreasonably pursuant to *Wiggins* and *Strickland*.

### b. Sub-claims (d) and (e) - counsel failed to present mitigating evidence during trial

Taking a somewhat contrary position to his assertion above that counsel failed to investigate mitigating evidence, Otte asserts here that counsel knew of, but did not present, evidence pertaining to his primary school records and "Covered Bridge School District" records, as well as mitigation witnesses who could have testified about Otte's difficult childhood and upbringing that mitigation specialist Pat Snyder collected as part of her investigation.  Otte raised this issue in his post-conviction petition and it is therefore preserved for federal habeas review.

The Eighth District Court of Appeals provided a well-reasoned analysis in denying this cause of action.  It held:

> Otte argued that trial counsel should have presented more information from the mitigation information in his possession and his failure to do so was ineffective. On appeal, Otte focuses on trial counsel's failure to call certain witnesses from

-67-

Terre Haute, Indiana, and failure to present certain school records and "Covered Bridge District records."

The trial court found that trial counsel made a reasonable tactical decision not to present more of the information gathered by its mitigation specialist during the penalty phase. The trial court relied on the testimony of attorney D'Angelo at the evidentiary hearing. D'Angelo recalled discussing the information with his co-counsel and the mitigation specialist. He remembers that much of the information could be viewed as a "double-edged sword." The trial court quoted at length D'Angelo's explanation of his decision. According to D'Angelo, Otte was involved in the decision not to use the mitigation evidence and said it was okay.

The presentation of mitigating evidence is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47. "[T]he mere failure to present mitigating evidence at the penalty phase of a capital trial does not itself constitute proof of ineffective assistance of counsel or deprivation of the accused's right to a fair trial." *Id.*

Otte's trial counsel did present witnesses who testified about problems he experienced as a child. In particular, Otte's parents testified on his behalf.

Otte contends his attorneys should have called certain witnesses to provide additional testimony about the difficulties he experienced as a child. Being mindful of what is necessary to constitute ineffective assistance of counsel, it is relevant to note that the Ohio Supreme Court explicitly gave "little weight to Otte's psychological problems and even less to his childhood difficulties." *State v. Otte* (1996), 74 Ohio St.3d 55. We are aware that the Ohio Supreme Court did not have the testimony of the Terre Haute witnesses or school records referred to at the post-conviction relief evidentiary hearing. Nonetheless, we are not reviewing this case in a vacuum and the Ohio Supreme Court's opinion is helpful towards ascertaining what impact additional information on this topic could have had on the outcome of Otte's sentence.

We have reviewed the deposition transcripts of the Terre Haute witnesses that were taken in 2002, ten years after Otte committed the underlying crimes. Otte's second and fifth grade teacher recalled him as a "very sad little boy" and that his parents were very involved and concerned because he was having problems. She recalled Otte's difficulty in getting along with other children. She described Otte as affectionate and not mean. Otte had trouble fitting in. Otte's fourth grade teacher recalled Otte having academic and social difficulties. He was often physically bullied but was passive and submissive. Otte had some learning difficulties and was not a strong student. The administrative secretary from Crawford Bridge School District testified that Otte's school records were destroyed February 27, 2002. She, however, indicated that the computer log

-68-

revealed a handwritten note that Otte was classified as seriously emotionally handicapped. According to this witness, there is no way to tell whether these records had been requested before. Lastly, the executive director of Chances for Indiana Youth testified that she worked with Otte for less than a year. Otte admitted to her that he was involved in drug use and having serious conflicts with his parents. Otte spent time at Gibault School, a detention facility, in the inpatient residential facility and the transitional home. Otte reportedly did well in this environment and his parents were very supportive. Otte also informed her that he had difficulties with going to church and with the Morman religion that his parents practiced. She described his drug abuse at that point beyond experimentation towards regular use, if not addiction.

All witnesses claimed they gave similar testimony to Otte's mitigation specialist in 1992 and would have willingly testified at his trial. The information gathered by the mitigation specialist is not part of this record. We have assessed the record, including trial counsel's stated reasons for not offering it in mitigation. Some of the evidence could have been viewed as damaging in that it documents Otte's continued social and academic problems, escalating substance abuse, and some trouble with the law. Because the mitigation materials are missing and the original school records were destroyed, the mitigation value of the school records cannot be determined notwithstanding that the computer log indicates that Otte was classified as seriously emotionally handicapped. Thus, we cannot say that the tactical decision not to use this information at the penalty phase was unreasonable.

*State v. Otte*, No. 84455, 2005 WL 77071, at *3-5 (Ohio Ct. App. Jan. 13, 2005).

The Eighth District's decision comports with the *Strickland* and *Wiggins* holdings.  At the post-conviction hearing, defense counsel provided the post-conviction court with unusual insight into the defense team debate that fueled their mitigation strategy.  Counsel recalled having many discussions with Pat Snyder regarding mitigation information that should or should not be presented during trial.  Counsel considered her instincts and judgments in making that decision:

A.     Well, she pointed out the kind of haunting nature of some of the reports

from earlier in the years of Mr. Otte's formative years and how he progressed and

as how concerned and also predictive of the future some of the experts who had

-69-

encountered Mr. Otte were and point[ed] out how sad it was.

       Also, kind of like a double edged sword nature to the information like that. How you can try to make a sympathetic case, but at the same time it cuts the other way because it shows someone that's kind of cold blooded and getting worse and dangerous and people were predicting certain things and, low and behold, look what happened here.

* * *

A.     And she also pointed out, I remember, because we had a lot of material that they pointed out specific passages of how certain teachers and others had predicted and how the behavior got more violent.  And she says, what do you do with stuff like this.  You can say it helps, but it hurts.

*Return*, Tr. Trans., Vol. 5, at 278; 281.

Based on counsel's disclosures regarding the conversations he had with his mitigation specialist and the reason he chose to present or omit evidence, the Court finds the Eighth District Court of Appeals' decision, which drew from counsel's account, was clearly a reasonable decision under *Strickland* and its progeny.  Counsel knew about the mitigating evidence Snyder had procured yet made a rational decision not to present it at trial because it had the potential of diminishing his character before the panel.  As *Strickland* teaches, strategic choices counsel make after a thorough investigation of fact and law are "virtually unchallengeable."  *Strickland*, 466 U.S. at 620.  This case proves to be no exception to that rule.  Had counsel presented the information regarding Otte's childhood that Otte now faults counsel for omitting, the prosecution could have underscored the escalating violence and drug use that occurred during those years.

-70-

Thus, counsel strategically chose to exclude this evidence at the mitigation hearing.  Counsel's well-informed decision on this issue was not unreasonable.  The Court finds that these sub-claims lack merit.

### c. Sub-claim (b) - failure to request a continuance

In his final sub-claim, Otte argues that counsel should have requested a continuance of the penalty phase once it became clear that Snyder would be unavailable during trial because of her hospitalization for Legionaries's disease and subsequent recuperation.  The Respondent asserts that Otte raised this claim as his sixth proposition of law on direct appeal and it is therefore not procedurally defaulted.  The Court reviews it on the merits.

Although Otte raised this claim on direct appeal to the Ohio Supreme Court,[20] that court did not provide any analysis of this claim in its opinion.  The Court finds, however, that this claim is not well-taken in any event.  Other than mere conjecture, Otte does not explain why it was necessary that Snyder actually attend the trial.  Defense counsel stated during the post-conviction hearing that he had many discussions with Snyder regarding the mitigating evidence she procured.  Moreover, Otte concedes in the petition that Snyder "personally delivered to Petitioner's main trial attorney two three-ringed-binders containing the detailed results of her investigation," in July of 1992.  *Petition*, at 59.  Thus, he cannot argue that Snyder's illness prevented counsel from consulting with her or obtaining the fruits of her labors.  Otte also does not allege that Snyder was so incapacitated during the time she was recuperating that she could

---

[20]     While Otte did not specifically state that counsel should have requested a continuance because of Snyder's illness, *Return*, Apx. Vol. 5, at 64, his general assertion that counsel should have requested a continuance of the penalty phase of trial to prepare for it adequately should satisfy the exhaustion requirement. *Chambers v. McCaughtry*, 264 F.3d 732, 738 (7th Cir. 2001).

not hold telephone conversations with counsel.  Because Otte does not state precisely why Snyder's failure to attend the trial worked to his detriment, he cannot demonstrate under *Strickland* that counsel were unreasonable for failing to request a continuance so that she could be present.  This claim is not well-taken.

> **12. Petitioner Otte was denied due process because both the trial court and the appellate courts failed to fulfill their statutory duties in imposing and reviewing his sentence of death, and the appellate courts failed to fulfill their obligation to meaningfully review the proportionality of Petitioner Otte's death sentence.**

Otte contends that the Eighth District Court of Appeals and the Ohio Supreme Court did not conduct an adequate proportionality and appropriateness review of his case.  Specifically, Otte claims that the Ohio courts improperly excluded cases in their review in which the State sought the death penalty but did not obtain it.  The Respondent alleges that this claim is procedurally defaulted because Otte failed to raise it on direct appeal.  Otte cannot overcome this default.  Thus, the Court will not address it on the merits.

This claim is not be well-taken in any event.  A proportionality review is not constitutionally required.  *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984).  *See also McQueen v. Scroggy*, 99 F.3d 1302, 1333–34 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997)("There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review.").  By statute, however, Ohio requires the appellate courts to engage in a proportionality review.  Under Ohio Revised Code § 2929.05(A):

> In determining whether the sentence of death is appropriate the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or

> the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

Ohio Rev. Code § 2929.05(A).

Because Ohio law requires appellate courts to engage in a proportionality review, the review must be consistent with constitutional requirements. *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 899 (E.D. Ky. 1988), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1990)(citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). Nonetheless, when the state courts have engaged in a proportionality review, the federal habeas court's review is limited. The habeas court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." *Id.* (citing *Moore v. Balkcom*, 716 F.2d 1511, 1517 (11th Cir. 1983)). *See also Spinkellink v. Wainwright*, 578 F.2d 582, 604 (5th Cir. 1978), *cert. denied*, 440 U.S. 976 (1979)(same).

> In *Spinkellink*, the petitioner argued
>
> that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences. All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he.

*Moore*, 716 F.2d at 1517–18 (quoting *Spinkellink*, 578 F.2d at 604). The court "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the [state] judicial system." *Id.* (citing *Spinkellink*). It held:

> A federal habeas court should not undertake a review of the state supreme court's

-73-

> proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases.  To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Id.*  Moreover, when examining an Ohio capital conviction on habeas review, the Sixth Circuit has stated that, because "proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison."  *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001).

The Ohio Supreme Court's review of Otte's sentence comports with constitutional requirements.  It held:

> We conclude that the death penalty is appropriate and proportionate for both convictions. R.C. 2929.05(A). As to the conviction for Kostura's murder, this court has previously upheld the death sentence in cases involving robbery-murder and multiple murder. *See, e.g., State v. Hicks* (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030; *State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274. We have also upheld the death sentence when there was evidence of intoxication or remorse. *Hicks, supra*; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212. The death penalty for Wasikowski's murder is proportionate to death penalties affirmed for cases involving robbery-murder or burglary-murder. *See State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; and *State v. Campbell* (1994), 69 Ohio St.3d 38, 630 N.E.2d 339.

*State v. Otte*, 660 N.E.2d 711, 723 (Ohio 1996).

This proportionality review does not "shock the conscience."  The Ohio Supreme Court reviewed cases in which the defendant killed for purposes of robbery and while intoxicated and found Otte's sentence proportionate based on the holdings in those cases.  This Court can provide no further review.

**13. Petitioner Otte's death sentence is unfairly disproportionate to similar cases, the Ohio courts denied him due process by failing to properly consider the proportionality of his death sentence.**

Otte asserts that his convictions and death sentence is disproportionate to the lack of punishment Jerry Cline, who Otte deems his accomplice, received.  After the second murder, the Parma Police questioned Cline about the murders but failed to charge him with any criminal wrongdoing.  Otte maintains that the disparity between his death sentence and Cline's lack of any criminal liability is a constitutional violation that entitles him to habeas relief.  The Respondent argues that this claim is procedurally defaulted because Otte never raised it in state court.  Otte does not allege cause and prejudice to excuse the default and, thus, the Court will not review this claim on the merits.[21]

### 14. Ohio's death penalty statute is unconstitutional in numerous respects.

Otte's fourteenth ground for relief is aimed at the structure of Ohio's capital punishment scheme.  He asserts Ohio's capital punishment scheme is unconstitutional on its face.  The Court addresses each sub-claims but is not persuaded by any of Otte's allegations.  In summary fashion, and regardless of their defaulted status, the Court lists below these allegations, in italics, and thereafter states the reasons they are unpersuasive.

---

[21]     Were it to do so, it would find that the claim lacks merit.  Recently, the Sixth Circuit reversed a death sentence on proportionality grounds, finding the disparity between the life sentence a defendant received in a murder for hire trial was disproportionate to the death sentence the actual killer received.  *Getsy v. Mitchell*, 456 F.3d 575 (6th Cir. 2006).  It concluded the petitioner's death sentence, "while the arguably more culpable [murder for hire defendant] received a life sentence for the *very same* crime, violates the Eighth Amendment, as construed by the Supreme Court in *Furman [v. Georgia*, 408 U.S. 238 (1972)] and *Enmund [v. Florida*, 458 U.S. 782 (1982)], and its prohibition of arbitrary and disproportionate death sentences."  *Id.* at 587 (emphasis in the original).

Unlike the co-defendant in *Getsy* who actually planned the murder, Cline merely suggested to Otte that the two victims would be easy targets for a robbery.  He was not involved at any stage in the planning or commission of the robbery murders.  Thus, the *Getsy* decision is inapposite here.

- *Ohio's death penalty is applied in an arbitrary and capricious manner.*  Other than bald assertion, Otte cites no specifics about the Ohio statutory scheme that substantiates his argument.  More importantly, Otte does not state why the Ohio courts' application of the death penalty statutes runs afoul of United States Supreme Court jurisprudence.

- *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial discretion to determine whether to seek a capital indictment.*  The United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

- *Ohio's scheme is unconstitutional because one of the aggravating circumstances merely repeats an element of the crime and fails to narrow the class of death-eligible defendants.*  The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty.  In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Court held any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant.  Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence.  *Id.* at 605.  The Court further refined the statutory limiting requirement in *Zant v. Stephens*, 462 U.S. 862 (1983).  In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible.  *Id.* at 177.  Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase.  *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1987).

   Ohio's death penalty scheme complies with these mandates.  First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors.  Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute.  Finally, the Ohio death penalty scheme satisfies the *Zant* requirements by demanding that the fact finder find the existence of at least one aggravating circumstance set forth in § 2929.04(A) before imposing the death penalty.

- *Ohio's scheme is unconstitutional because it imposes a risk of death on those capital defendants who choose to exercise their right to trial.*  In *United States v. Jackson*, 390 U.S. 570, 582 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial.  In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only the jury to impose the death sentence.  Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial."  *State v. Buell*, 489 N.E.2d 795, 808 (Ohio 1986).  Consequently, the Ohio scheme comports with constitutional mandates.

- *Felony murderers are treated more harshly than premeditated murderers.*  Here, Otte presumably is asserting that the Ohio death penalty scheme violates the due process clause because  one of the aggravating factors for capital felony murder merely repeats an element of the crime.  As stated above, the Ohio death penalty comports with Supreme Court jurisprudence that requires a statutory scheme to limit the class of death-eligible defendants.  Moreover, this "double counting" system was upheld in *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1987).  *See also State v. Jenkins*, 473 N.E.2d 264 (Ohio 1984)(noting that under Ohio Revised Code § 2929.04(A)(7) a state must not only prove that the defendant caused the death of another to establish the aggravating circumstance, but it also must prove that the defendant was the principal offender in the commission of the aggravated murder, or that the aggravated murder was committed with prior calculation and design.).  This additional factor complies with the narrowing prerequisites set forth in *Lowenfield*.

- *Ohio's scheme is unconstitutional because it provides for a bifurcated system in which the identical jurors find for guilt and later sentence the defendant.  This use of the jury places the defendant at a tactical disadvantage.*  Otte points to no authority that would hold this provision of the Ohio death penalty constitutionally infirm.  Furthermore, the bifurcated system long has been credited as a system having the desired effect of narrowing the class of death-eligible defendants.  *Lockett v. Ohio*, 438 U.S. 586 (1978).

- *Ohio's scheme is unconstitutional because it precludes the jury from imposing a life sentence when the aggravating factors outweigh the mitigating circumstances.*  The Supreme Court rejected a similar argument in *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).

- *Ohio's scheme is unconstitutional because it fails to require the jury to find a conscious desire to kill or specific intent to kill.*  This argument is groundless as Ohio Revised Code § 2903.01(E) states that no person can be convicted of aggravated murder unless he or she is "specifically found to have intended to cause the death of another . . . ."  Moreover, the Supreme Court sanctioned the use of a criminal state of mind less culpable than intent, *i.e.*, reckless indifference, as an acceptable level of culpability to impose the death penalty.  *See Tison v. Arizona*, 481 U.S. 137, 156 (1986)(affirming death sentence of capital defendant who took part in prison escape but was not present when murder of kidnapped family occurred because he possessed a "reckless disregard for human life.").

- *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be submitted to the jury once the defendant requests it.*  Although the Fifth Amendment would be violated if a court *orders* a defendant to undergo a psychiatric examination, without informing the defendant that his statements can be used against him, and then admits his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, *see Estelle v. Smith*, 451 U.S. 454 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself.  This reasoning is explained in *Buchanan v. Kentucky*, 483 U.S. 402 (1987):

-77-

A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Id.* (citations omitted).

- *Ohio's scheme is unconstitutional because it fails to require that the State prove the absence of any mitigating factors.* This argument was specifically rejected in *Walton v. Arizona*, 497 U.S. 639, 649–50 (1990). There the Court held a death penalty scheme requiring the defendant to establish mitigating factors by a preponderance of evidence is constitutionally acceptable burden shifting. This aspect of the *Walton* holding is unaltered by the Supreme Court decision *Ring v. Arizona*, 536 U.S. 584 (2002).

- *Ohio's scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.* No such constitutional mandate exits. Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

- *Ohio's scheme is unconstitutional because the defendant must prove the existence of mitigating factors by a preponderance of evidence.* This argument is addressed in a previous claim. The Court will not re-address it.

- *Ohio's scheme requires a capital factfinder to impose a death sentence even if it wishes to show mercy or believes the death sentence is inappropriate despite the fact that the aggravating circumstances outweigh the mitigating factors.* The Supreme Court rejected an argument similar to this one in *Blystone v. Pennsylvania*, 494 U.S. 299 (1990). In that case, the defendant challenged the constitutionality of the Pennsylvania death penalty statutes, which, similar to Ohio's, requires that the jury impose the death penalty if the aggravating circumstances outweigh the mitigating factors. In upholding this statutory scheme, the *Blystone* Court determined that the statutes were constitutional because they permitted the sentencer "to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Id.* at 304–5 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 328(1989))(internal quotation marks omitted). Ohio's death penalty statutes permit the sentencing body to consider all mitigating evidence pursuant to the "catch-all" mitigating factor, Ohio Revised Code §

2929.04(B)(7).[22]  Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

- *Ohio's scheme is unconstitutional because a three-judge panel is not required to identify and articulate the existence of mitigating factors and aggravating circumstances.*  While the Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," *Gardner v. Florida*, 420 U.S. 349, 361 (1977), there is no actual criterion stating the trial judge must identify and articulate the specific factors used to formulate the decision.  Furthermore, Ohio Revised Code § 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors.  By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness."  *State v. Buell*, 22 Ohio St.3d 124, 137 (1986), *cert. denied*, 479 U.S. 871 (1986).   Thus, no constitutional infirmity exists.

- *Ohio's scheme is unconstitutional because it provides an inadequate proportionality review.*  The Court addressed this argument in Otte's twelfth claim for relief.  The Court will not readdress it here.

- *Ohio's scheme is not the least restrictive means of effectuating deterrence.*  The United States Supreme Court addressed this exact point in *Gregg v. Georgia*, 428 U.S. 153 (1976).  Noting that imposing criminal punishment is a legislative responsibility, the Court limited its own ability to "require the legislature to select the least severe penalty possible."  *Id.* at 175.

- *Ohio's scheme diminishes the dignity of man.*  While Otte's argument may be a ground for advocating for the abolition of the death penalty, he has not articulated a legal claim for which this Court can provide him habeas relief.

---

[22]     That statute states:

> (B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, . . . , the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
>
> ***
>
> (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

Ohio Rev. Code § 2929.04(B)(7).

• *Imposition of the death penalty is a violation of international treaties.*  The Sixth Circuit has held in an Ohio capital habeas case that "[w]hether and how the United States wishes to react to [criminal] violations are domestic questions" not subject to the dictates of international law.  *Buell v. Mitchell*,  274 F.3d 337, 375 (6th Cir. 2001)(quoting *Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475 (9th Cir.1994)(further citations omitted)).  *See also State v. Steffen*, No. C-930351, 1994 WL 176906, at *4 (Ohio Ct. App. May 11, 1994)(holding that there was no colorable argument supported by precedent from any human rights forum that the arrest, incarceration, trial, and sentence of an individual violated human norms to which the United States is bound either by customary international law or treaty).

> **15. Mr. Otte's conviction and sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial and in all subsequent proceedings.**

Otte asserts that he is entitled to habeas relief based on cumulative errors that occurred during his state court proceedings.  As stated above, the Sixth Circuit in *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006), acknowledged that "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Id.* at 816 (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir.2005)).  *See also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006)(holding that while errors might accumulate to produce unfair trial setting, Supreme Court has never held distinct claims can accumulate to grant habeas relief); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *and cert. denied at*, 538 U.S. 947 (2003)(same). Accordingly, this claim is not well-taken.

**VIII.  Certificate of Appealability Analysis**

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Otte's claims.  The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a

-80-

capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Otte presented in his Petition pursuant to 28 U.S.C. § 2253.

> That statute states in relevant part:
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  *Id.* at 483.  Thus, the Court determined

-81-

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

*Id*. at 483–04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id.* at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*  (emphasis supplied).

After taking the above standard into consideration, the Court finds as follows.

The Court will not issue a COA for claims 1(b), 2, 3, 4, and 5 because they were raised for the first time in the post-conviction court.  The Eighth District Court of Appeals found that these claims could have been raised on direct appeal and barred them on grounds of *res judicata*.  Accordingly, they are unequivocally procedurally defaulted.

Equally undisputed is the defaulted status of claims 1(c), 10(a), (c), (d), (g), and (h), 11(f), 12, and 13.  These claims were never raised at any point in Otte's state court appeals.  Thus, the Court will not issue a COA for these claims.

No COA will issue for grounds 6 and 15 (cumulative error pertaining to jury waiver and

with state-court proceedings generally).  As stated above, cumulative error is not a cognizable ground for habeas relief in this Circuit.  No jurist of reason would debate this conclusion.

The Court will not issue a COA for grounds for relief 8, 9, and 10(i)(ineffective assistance of counsel for failure to hire pharmacologist and toxicologist).  The dearth of evidence in the record regarding Otte's drug ingestion prior to the Wasikowski murder and his attempts to cover up both murders indicate Otte maintained a level of understanding of his own wrongdoing.  Thus, it is unlikely that counsel's efforts to obtain these experts and adduce their trial testimony would have altered the outcome of the trial.  Moreover, Otte cannot demonstrate sufficient prejudice from failing to hire these experts to testify during the penalty phase of the trial to make out a successful claim of ineffective assistance of counsel at that juncture.  No jurist of reason would debate these findings.

Reasonable jurists also would not debate the Court's finding that ground for relief 10, sub-claims (b) and (e)(counsel ineffective during culpability phase of trial for failing to cross-examine State witnesses and for failing to present evidence), should not be reviewed on appeal because they are too vague to address.  Reasonable jurists would not debate its conclusions regarding those sub-claims.  The Court will not grant a COA for sub-claim (f)(ineffective assistance for stipulating to fingerprint evidence), because counsel were not unreasonable for stipulating to physical evidence inculpating Otte for a murder to which he already confessed.  This finding is unequivocal.

No COA will issue for sub-claims (a), (b), (c), and (f) of ground for relief 11 (ineffective assistance of counsel during mitigation phase of trial).  No jurist of reason would debate this Court's finding that defense counsel knew about most, if not all, of the evidence Otte asserts

counsel failed to discover.  Thus, no COA will issue for sub-claims (a) and (c).  Moreover, as stated above, counsel's failure to request a continuance because of Snyder's unavailability during trial was not unreasonable because they already had obtained the information she procured and there was no indication her illness prevented her from consulting with counsel during trial.  Consequently, the Court will not issue a COA for sub-claim (b).  No COA will issue for sub-claim (f) because it is unequivocally procedurally defaulted.

Finally, the Court will not issue a COA for any of the sub-claims in ground 14 (unconstitutionality of the death penalty).  These claims occur almost *pro forma* in capital habeas petitions but are routinely denied.  Reasonable jurists would agree with this finding.

Conversely, the Court will issue a COA for ground for relief 1(a)(influence of drugs on ability to waive jury trial).  While the Court finds that the factual findings of the post-conviction court regarding the experts who testified during the hearing were not unreasonable, a reasonable jurist could conclude that Otte's use of Mellaril and its side effects at the time of the waiver were sufficient grounds to concur with Dr. Nockowitz's opinion that Otte could not have made a knowing and intelligent waiver of his right to trial.

Reasonable jurists also could debate the Court's conclusion that ground for relief 7 (no mental capacity to waive *Miranda* rights), has no merit.  While the Court finds that the Eighth District Court of Appeals' finding regarding the effects of alcohol withdrawal and the lack of any evident police coercion render this claim meritless, it also finds that a jurist of reason could credit the reports of Dr. Kandiko and Dr. Smith in deciding that Otte did not have sufficient presence of mind to knowingly and voluntarily waive his *Miranda* rights.  Thus, the Court issues a COA for this claim.

The Court grants a COA for sub-claims (d) and (e) of ground for relief 11 (ineffective assistance during mitigation phase of trial).  While the Court concludes that counsel thoroughly investigated the mitigating evidence, by way of hiring a mitigation specialist and psychologist, and that counsel omitted some of that evidence for strategic reasons because some of it was actually harmful to Otte, reasonable jurists could find that counsel's failure to present at least some of this mitigating evidence left the panel with no alternative but to impose a death sentence.   Accordingly, the Court issues a COA for these sub-claims.

**IX. Conclusion**

For the foregoing reasons, the Petition is denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to grounds 1(a), 7, and 11(d) and (e), and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed.R.App.P. 22(b) as to those grounds only.  As to all remaining grounds, the should Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed.R.App.P. 22(b).

IT IS SO ORDERED.


 /s/ Patricia A.Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 2/12/08